UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION


DOLAN DARLING,
a/k/a SEAN SMITH,

                    Petitioner,

v.                                                    Case No. 6:07-cv-1701-Orl-31GJK

SECRETARY, FLORIDA DEPARTMENT
OF CORRECTIONS, et al.,

                    Respondents.

_____

_____    **ORDER**

        This case is before the Court on the Petition for Habeas Corpus Relief (Doc. No. 1)

filed by Dolan Darling, also known as Sean Smith.  Pursuant to the instructions of the

Court, Respondents filed a Response to Petition for Writ of Habeas Corpus (Doc. No. 14).

Thereafter, Petitioner filed a Reply to the Response (Doc. No. 22).  As discussed hereinafter,

the habeas petition is denied.

## I.      STATEMENT OF FACTS

        The facts adduced at trial, as set forth by the Supreme Court of Florida, are as

follows:

                The victim in this case, Grazyna Mlynarczyk ("Grace"), was a
        thirty-three-year-old Polish female living illegally in the United States.  The
        State's first witness, Zdzislaw Raminski (known as "Jesse"), had met the
        victim in Poland in 1990 or 1991.  Grace and Jesse developed a personal

1

relationship, which continued when Grace moved to Orlando on September 28, 1992.

Jesse owned and operated Able Transportation, which provided shuttle service to and from the airport, and Grace was employed part-time with this enterprise. The last time Jesse saw Grace alive was on the morning of October 29, 1996, at around 9:30. At that time she was wearing shorts and a small shirt, as she was doing laundry in a facility at her apartment complex. Jesse did not exit his vehicle when talking with Grace only briefly that morning. She told Jesse that she had an appointment with a gynecologist later that day. Jesse gave Grace an AmSouth Bank envelope containing three hundred dollars cash in payment for work she had performed for the company during the prior week. Jesse drove away from the apartment complex and proceeded to work. Jesse again spoke with Grace around 10:15 a.m. by phone, and she indicated that she was still doing laundry, and would call him after she returned from her doctor's appointment. Although Jesse continued to telephone Grace throughout the day, he was unable to reach her again. Around 4:10 p.m., Jesse called again and was still unable to reach Grace. He became concerned that she had not telephoned him after her doctor's appointment, so he returned to her apartment complex.

Upon arriving there, he was surprised to find that the blinds to Grace's apartment-which she never closed during the daytime-were closed. He used his key to enter the apartment, where he found a basket with laundry in the living room, and the door to the bedroom closed. He recalled seeing no disturbed objects in the apartment. Upon entering the bedroom, however, he found Grace. She was on her back on the floor, naked from the waist down, with her face near the bed and her legs inside the closet. When she did not respond to him, Jesse moved Grace to the bed, and discovered that she was cold, and had blood on her. He proceeded to call 911 for assistance and members of the fire department arrived shortly thereafter. They soon determined that Grace was dead.

Officers from the Orange County Sheriff's Office responded to the scene and secured items of evidence found in the bathroom, which included a lotion bottle, a pair of panties, and a pink throw pillow. The pillow had a blackened area and a gunshot hole through the sides. There was blood spatter on the door of the closet, and blood present in the closet area. Two AmSouth Bank envelopes were found which contained cash totaling approximately twelve hundred dollars and a shoe box was discovered which contained one thousand dollars. There was also a wallet which held fifty-eight dollars. Jewelry located in boxes appeared to be undisturbed.

An officer who had canvassed Grace's neighborhood to determine whether there were witnesses with information regarding the murder testified that he had contacted Darling on October 30, the day after the murder. Darling's apartment was located just north of Grace's apartment. In response to the investigating officer's inquiry, Darling had said that "he was working and didn't know anything of the incident."

Dr. William Robert Anderson of the Orlando Medical Examiner's Office testified at trial. His testimony included a discussion concerning the "defect" in the pillow, particularly the "cloud of soot" from the "burning gun powder" left on the pillow as the "bullet comes out." The gun was fired at close range because he observed "in the victim only a small amount of soot material. But . . . on the pillow there is a significant amount of that soot material." Dr. Anderson indicated that "the end of the weapon was up against that pillow . . . fairly tightly." He also testified that the "defect in the middle is consistent with a bullet passing through . . , creating a tear." When the doctor first saw Grace, "[r]igor mortis was complete," and he estimated that she "was probably dead at least six hours from the time we saw her, which was about seven."

Dr. Anderson testified that the bullet entered "the right back of the head." Grace had an abrasion there "consistent with something having been up against the cloth transferring energy across to the skin and creating that." "That pillow" was consistent with the abrasion. The doctor found that Grace had "some vaginal injuries, but nothing that would make her bleed significantly." There was "[a] lot of bleeding . . . inside the brain," but "she's gonna die pretty quick." He stated that "[c]onsciousness would probably not be more than a few seconds," and that "[s]he would have no motor activity" or any "ability to move anything at that point." The doctor stated that "the rapidity [with] which she dies" is "one of the reasons she probably didn't bleed."

The doctor stated that there was "seminal purulent" in Grace's vaginal area and bruising on the "back of the elbows . . . consistent with some moving around." There was "a hemorrhage," which "means that took place when circulation was alive." The vaginal area abrasions were "consistent with vaginal trauma from penetration of some object, penial, digital, some other object." The doctor pointed out that the "tear of the labia majora, which is a very sensitive area" was "quite painful," adding: "This would not be consistent with consensual sex, in that the pain would interrupt the activity. It would be painful enough that consensual sex would not apply after that point." The doctor observed that "there wasn't anything in the

labia that would explain those abrasions other than trauma." The victim's "rectal area" had "some tears," which were caused by "[d]igital penetration, penial penetration, some trauma." The doctor opined that this, too, was painful. He further indicated that the "gunshot wound to the head with the injuries . . . described" was the cause of Grace's death.

Photographs and records of fingerprints found in Grace's apartment were developed and submitted to a comparison expert. A photograph of fingerprints from the lotion bottle was developed, and admitted into evidence as Exhibit 14. At trial, the State's expert in the detection, enhancement, and recording of fingerprints opined that the fingerprint on the lotion bottle had been there for less than one year. The State's expert in the area of fingerprint comparison compared the fingerprints on Exhibit 14 with fingerprints obtained from Darling. He testified at trial that he found a print on the lotion bottle which matched that of Darling's right thumb.

The State's expert in the area of forensic serology tested vaginal swabs and a rectal smear which were taken from the victim's body, and found semen on them. A stain card containing Darling's blood which had been prepared for examination and comparison was admitted into evidence at trial without objection.

David Baer, a Senior Crime Laboratory Analyst in the DNA Section of the Florida Department of Law Enforcement (FDLE) Orlando Crime Laboratory, also testified as an expert at trial. . . .

* * *

Baer . . . testified regarding the DNA examination which he had performed on Darling's blood and the vaginal swabs containing sperm. He stated that the test performed on the subject semen sample was one which had been used consistently for the past nine years. As a result of the testing, Baer concluded that the DNA from Darling's blood sample had both a strong band and a weak band which matched the male fraction found on the vaginal swabs containing sperm from Grace's vagina. Baer explained that a statistical analysis was performed using the resultant data: "Once I determin[e] that a profile does match I'll then do a statistical interpretation of the profile to determine how common would this profile be in the general population." In this case, after finding ten independent genetic markers, Baer determined the frequency of each of them.

Baer stated that he had computed numbers that varied depending

upon which of the different databases were used. Based upon the Caucasian database, and using the product rule with the plus or minus 1.735 bin window, Darling's DNA profile would have a frequency of about one out of 239 billion. Using the modified ceiling method, with "the larger match window," the match frequency would be "one out of ninety-nine billion Caucasians."

Applying the product rule with the plus or minus 1.735 bin window to the FBI's African-American population database, Darling's DNA profile would have a frequency of "one out of 104 billion" African-Americans. Using the modified ceiling method, with "the larger match window," the match frequency would be one out of 101 billion African-Americans.

Using the California Hispanic database, and the product rule with the plus or minus 1.735 bin window, Darling's DNA profile would have a frequency of "one out of 1.7 billion, eighty-one Hispanics." Using the modified ceiling method, with "the larger match window," the match frequency would be one out of 1.3 trillion Hispanics.

*Darling v. State*, 808 So. 2d 145, 148-52 (Fla. 2002) (footnotes omitted).

## II. PROCEDURAL HISTORY

Petitioner was charged by indictment with one count of first-degree murder, one count of armed sexual battery, and one count of armed robbery. (Ex. A-5 at 405-06.)[1] A jury trial was conducted, after which Petitioner was found guilty of first degree murder and armed sexual battery. (Ex. A-13 at 787-88.) The state trial court granted Petitioner's motion for acquittal for the charge of armed robbery. (Ex. A-7 at 792.) A penalty proceeding was conducted, and the jury recommended by a vote of eleven to one that the trial court impose the death penalty upon Petitioner. (Ex. A-8 at 1086.) Thereafter, the trial

---

[1]References to the record will be made by citing to the particular volume and page of the advanced appendix. For example, "Ex. A at 1" refers to page one of the volume labeled Exhibit A.

judge conducted a hearing pursuant to *Spencer v. State*, 615 So. 2d 688 (Fla. 1993), after which it found two aggravating factors, the statutory age mitigator, and several non-statutory mitigators.[2]  *Id*. at 1127-95.  The state trial court concluded that the aggravating circumstances outweighed the mitigating circumstances and as such, followed the jury's recommendation and sentenced Petitioner to death for the first degree murder conviction. *Id*. at 1127-95.  The trial court further sentenced Petitioner to 256.6 months for the armed sexual battery conviction.

On direct appeal, Petitioner raised eleven claims. (Ex. B.)  The Supreme Court of

---

[2]The state trial court found the statutory aggravators that Petitioner was previously convicted of a felony involving the use or threat of violence and the capital felony was committed while Petitioner was engaged in an armed sexual battery. (Ex. A-8 at 1121-22.) The state trial court found nineteen nonstatutory mitigating factors, (1) Petitioner's behavior at trial was acceptable (little weight); (2) Petitioner has an IQ of 85 (some weight); (3) Petitioner believes in God (slight weight); (4) Petitioner was and is a caring son to his mother (some weight); (5) Petitioner is a caring father to his daughter, and she will need his love and encouragement in her life (moderate weight); (6) Petitioner was an abused child (most weighty of the mitigating factors-due consideration); (7) Petitioner has an alcoholic father (considered with factor 6); (8) Petitioner was never violent toward his mother or girlfriend (considered with factor 4); (9) Petitioner had no father figure or male role model (considered with factor 6); (10) Petitioner sent cards for holidays and birthdays to his family members (slight weight); (11) Petitioner was and is a concerned brother (slight weight); (12) Petitioner has a child who will not have a father if he is executed (considered with factor 5); (13) Petitioner has a good employment history (slight weight); (14) Petitioner was not exposed to a normal mother/father relationship as a result of his father's philandering (considered with factor 6); (15) Petitioner's mother and father were never married, and this caused Petitioner embarrassment during his childhood (considered with factor 6); (16) Petitioner is a human being (not recognized as a separate mitigating factor); (17) Petitioner has the love and support of his family (slight weight); (18) Petitioner has been unwavering in his declaration of innocence (slight weight); and (19) if Petitioner is sentenced to life in prison, he will be isolated from his friends and family who reside in a foreign country (moderate weight).  *Id*. at 1123-26.

Florida affirmed Petitioner's conviction and sentence.  *Darling*, 808 So. 2d 145.  Petitioner filed a petition for writ of certiorari with the United States Supreme Court, which was denied.  (Ex. F-4)

On September 24, 2003, Petitioner filed a motion for postconviction relief pursuant to Florida Rule of Criminal Procedure 3.851.  (Ex. G-7 at 1256-1370.)  The state court summarily denied and struck several of Petitioner's claims, Ex. G-8 at 1534-44, 1563-64, and ordered an evidentiary hearing on some claims.  (Ex. G-7 at 1534-44.)  After the evidentiary hearing, the trial court denied the remaining claims.  (Ex. G-9 at 1768-1800.)  Petitioner appealed, and the Supreme Court of Florida affirmed.  *Darling v. State*, 966 So. 2d 366 (Fla. 2007).

Petitioner further filed a state petition for writ of habeas corpus in the Supreme Court of Florida, alleging ineffective assistance of appellate counsel.  (Ex. K.)  The Supreme Court of Florida denied the petition.  *Darling*, 966 So. 2d 366.

After filing the instant petition for writ of habeas corpus, Petitioner filed a successive Rule 3.851 motion for postconviction relief in the state court, which remains pending.[3]  (Ex. O-8.)

## III.    GOVERNING LEGAL PRINCIPLES

Because Petitioner filed his petition after April 24, 1996, this case is governed by 28

---

[3]After Respondents filed their Response to the Petition (Doc. No. 14), Petitioner filed a motion to amend the habeas petition and to hold the proceedings in abeyance.  (Doc. No. 18.)  The Court denied the motion to amend and to hold the proceedings in abeyance.  *See* Doc. No. 21.

U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). *Penry v. Johnson*, 532 U.S. 782, 792 (2001); *Henderson v. Campbell*, 353 F.3d 880, 889-90 (11th Cir. 2003). The AEDPA "establishes a more deferential standard of review of state habeas judgments," *Fugate v. Head*, 261 F.3d 1206, 1215 (11th Cir. 2001), in order to "prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." *Bell v. Cone*, 535 U.S. 685, 693 (2002); *see also Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (recognizing that the federal habeas court's evaluation of state-court rulings is highly deferential and that state-court decisions must be given the benefit of the doubt).

## A.    Standard of Review Under the AEDPA

Pursuant to the AEDPA, habeas relief may not be granted with respect to a claim adjudicated on the merits in state court unless the adjudication of the claim:

> (1)    resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2)    resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). The phrase "clearly established Federal law," encompasses only the holdings of the United States Supreme Court "as of the time of the relevant state-court decision." *Williams v. Taylor*, 529 U.S. 362, 412 (2000); *see also Schwab v. Crosby*, 451 F.3d 1308, 1324 (11th Cir. 2006) (stating that the federal law relevant to this analysis is the United States Supreme Court precedent "in existence at the time the conviction became final"),

*cert. denied*, 127 S. Ct. 1126 (2007).

"[S]ection 2254(d)(1) provides two separate bases for reviewing state court decisions; the 'contrary to' and 'unreasonable application' clauses articulate independent considerations a federal court must consider." *Maharaj v. Secretary for Dep't. of Corr.*, 432 F.3d 1292, 1308 (11th Cir. 2005). The meaning of the clauses was discussed by the Eleventh Circuit Court of Appeals in *Parker v. Head*, 244 F.3d 831, 835 (11th Cir. 2001):

> Under the "contrary to" clause, a federal court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the United States Supreme Court] on a question of law or if the state court decides a case differently than [the United States Supreme Court] has on a set of materially indistinguishable facts. Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the United States Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case.

If the federal court concludes that the state court applied federal law incorrectly, habeas relief is appropriate only if that application was "objectively unreasonable." *Id.*

Finally, under § 2254(d)(2), a federal court may grant a writ of habeas corpus if the state court's decision "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." A determination of a factual issue made by a state court, however, shall be presumed correct, and the habeas petitioner shall have the burden of rebutting the presumption of correctness by clear and convincing evidence. *See Parker*, 244 F.3d at 835-36; 28 U.S.C. § 2254(e)(1).

**B.     Standard for Ineffective Assistance of Counsel**

The United States Supreme Court in *Strickland v. Washington*, 466 U.S. 668 (1984), established a two-part test for determining whether a convicted person is entitled to relief

on the ground that his counsel rendered ineffective assistance: (1) whether counsel's performance was deficient and "fell below an objective standard of reasonableness"; and (2) whether the deficient performance prejudiced the defense.[4] *Id.* at 687-88. A court must adhere to a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. *Id.* at 689-90. "Thus, a court deciding an actual ineffectiveness claim must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." *Id.* at 690; *Gates v. Zant*, 863 F.2d 1492, 1497 (11th Cir. 1989).

As observed by the Eleventh Circuit Court of Appeals, the test for ineffective assistance of counsel:

> has nothing to do with what the best lawyers would have done. Nor is the test even what most good lawyers would have done. We ask only whether some reasonable lawyer at the trial could have acted, in the circumstances, as defense counsel acted at trial. Courts also should at the start presume effectiveness and should always avoid second guessing with the benefit of hindsight. *Strickland* encourages reviewing courts to allow lawyers broad discretion to represent their clients by pursuing their own strategy. We are not interested in grading lawyers' performances; we are interested in whether the adversarial process at trial, in fact, worked adequately.

*White v. Singletary*, 972 F.2d 1218, 1220-21 (11th Cir. 1992) (citation omitted). Under those rules and presumptions, "the cases in which habeas petitioners can properly prevail on the ground of ineffective assistance of counsel are few and far between." *Rogers v. Zant*, 13 F.3d

---

[4]In *Lockhart v. Fretwell*, 506 U.S. 364, 372 (1993), the United States Supreme Court clarified that the prejudice prong of the test does not focus solely on mere outcome determination; rather, to establish prejudice, a criminal defendant must show that counsel's deficient representation rendered the result of the trial fundamentally unfair or unreliable.

384, 386 (11th Cir. 1994).

Additionally, it is well established that a defendant has the right to effective counsel on appeal. *Alvord v. Wainwright*, 725 F.2d 1282, 1291 (11th Cir. 1984). The Eleventh Circuit Court of Appeals has applied the United States Supreme Court's test for ineffective assistance at trial to guide its analysis of ineffective assistance of appellate counsel claims. *Heath v. Jones*, 941 F.2d 1126, 1130 (11th Cir. 1991); *Matire v. Wainwright*, 811 F.2d 1430, 1435 (11th Cir. 1987). Thus, in order to establish ineffective assistance of appellate counsel, Petitioner must show (1) that counsel's performance was deficient and "fell below an objective standard of reasonableness" and (2) that the deficient performance prejudiced the defense. *Strickland*, 466 U.S. at 687-88.

## C.    Exhaustion and Procedural Default

One procedural requirement set forth in the AEDPA precludes federal courts, absent exceptional circumstances, from granting habeas relief unless the petitioner has exhausted all means of available relief under state law. 28 U.S.C. § 2254(b); *O'Sullivan v. Boerckel*, 526 U.S. 838, 842-22 (1999); *Picard v. Connor*, 404 U.S. 270, 275 (1971). Specifically, the AEDPA provides, in pertinent part:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that–
>
> (A)    the applicant has exhausted the remedies available in the courts of the State; or
>
> (B)    (i)    there is an absence of available State corrective process; or

        (ii)     circumstances exist that render such process ineffective
                    to protect the rights of the applicant.

28 U.S.C. § 2254(b)(1).

Thus, a federal court must dismiss those claims or portions of claims that have been denied on adequate and independent procedural grounds under state law. *Coleman v. Thompson*, 501 U.S. 722, 750 (1991). In addition, a federal habeas court is precluded from considering claims that are not exhausted but would clearly be barred if returned to state court. *Id*. at 735 n.1 (stating that if the petitioner failed to exhaust state remedies and the court to which the petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred, there is a procedural default for federal habeas purposes regardless of the decision of the last state court to which the petitioner actually presented his claims).

In order to satisfy the exhaustion requirement, a state petitioner must "fairly presen[t] federal claims to the state courts in order to give the State the opportunity to pass upon and correct alleged violations of its prisoners' federal rights." *Duncan v. Henry*, 513 U.S. 364, 365 (1995) (citing *Picard*, 404 U.S. at 275-76) (internal quotation marks omitted). The petitioner must apprise the state court of the federal constitutional issue, not just the underlying facts of the claim or a similar state law claim. *Snowden v. Singletary*, 135 F.3d 732 (11th Cir. 1998). The United States Supreme Court has observed that "Congress surely meant that exhaustion be serious and meaningful." *Keeney v. Tamayo-Reyes*, 504 U.S. 1, 10 (1992). Furthermore, the Court explained:

[c]omity concerns dictate that the requirement of exhaustion is not satisfied

> by the mere statement of a federal claim in state court. Just as the State must afford the petitioner a full and fair hearing on his federal claim, so must the petitioner afford the State a full and fair opportunity to address and resolve the claims on the merits.

*Id.*; *see also Henderson*, 353 F.3d at 898 n.25 ("Both the legal theory and the facts on which the federal claim rests must be substantially the same for it to be the substantial equivalent of the properly exhausted claim.").

Procedural default will be excused only in two narrow circumstances. First, a petitioner may obtain federal review of a procedurally defaulted claim if he can show both "cause" for the default and actual "prejudice" resulting from the default. "To establish 'cause' for procedural default, a petitioner must demonstrate that some objective factor external to the defense impeded the effort to raise the claim properly in the state court." *Wright v. Hopper*, 169 F.3d 695, 703 (11th Cir. 1999). To establish "prejudice," a petitioner must show that there is at least a reasonable probability that the result of the proceeding would have been different. *Henderson*, 353 F.3d at 892 (citations omitted).

The second exception, known as the "fundamental miscarriage of justice," only occurs in an extraordinary case, in which a "constitutional violation has probably resulted in the conviction of one who is actually innocent." *Murray v. Carrier*, 477 U.S. 478, 496 (1986). Actual innocence means factual innocence, not legal insufficiency. *Bousley v. United States*, 523 U.S. 614, 623 (1998). To meet this standard, a petitioner must "show that it is more likely than not that no reasonable juror would have convicted him" of the underlying offense. *Schlup v. Delo*, 513 U.S. 298, 327 (1995). In addition, "'[t]o be credible,' a claim of actual innocence must be based on [new] reliable evidence not presented at trial." *Calderon*

*v. Thompson*, 523 U.S. 538, 559 (1998) (quoting *Schlup*, 513 U.S. at 324).

**IV.    MERITS OF THE PETITION**

**A.    Claim I**

Petitioner asserts that the state court erred in denying his motion for judgment of acquittal.  In support of claim one, Petitioner maintains that the evidence adduced at trial was not sufficient to support a finding of guilt beyond a reasonable doubt.  Specifically, he argues that the DNA evidence and the fingerprint evidence without more were insufficient to establish the identity of the perpetrator because such evidence could have been indicative of consensual sex and the semen could have been deposited in the victim,  and the fingerprint left on the lotion bottle, prior to the murder.

Petitioner raised this claim on direct appeal.  In denying the claim, the Supreme Court of Florida first noted that pursuant to Florida law, when a conviction is based solely upon circumstantial evidence, the following standard of review applies to the denial of a motion for judgment of acquittal:

> Where the only proof of guilt is circumstantial, no matter how strongly the evidence may suggest guilt, a conviction cannot be sustained unless the evidence is inconsistent with any reasonable hypothesis of innocence. The question of whether the evidence fails to exclude all reasonable hypotheses of innocence is for the jury to determine, and where there is substantial, competent evidence to support the jury verdict, we will not reverse.
>
> * * *
>
> . . . A motion for judgment of acquittal should be granted in a circumstantial evidence case if the state fails to present evidence from which the jury can exclude every reasonable hypothesis except that of guilt. Consistent with the standard set forth in *Lynch*, if the state does not offer evidence which is inconsistent with the defendant's hypothesis, "the

14

evidence [would be] such that no view which the jury may lawfully take of it favorable to the [state] can be sustained under the law." 293 So.2d at 45. The state's evidence would be as a matter of law "insufficient to warrant a conviction." Fla. R. Crim. P. 3.380.

It is the trial judge's proper task to review the evidence to determine the presence or absence of competent evidence from which the jury could infer guilt to the exclusion of all other inferences. That view of the evidence must be taken in the light most favorable to the state. The state is not required to "rebut conclusively every possible variation" of events which could be inferred from the evidence, but only to introduce competent evidence which is inconsistent with the defendant's theory of events. Once that threshold burden is met, it becomes the jury's duty to determine whether the evidence is sufficient to exclude every reasonable hypothesis of innocence beyond a reasonable doubt.

*Darling,* 808 So. 2d at 155-56 (quoting *State v. Law*, 559 So.2d 187, 188-89 (Fla. 1989)).

Applying this standard, the Court recognized that Petitioner's theory of innocence was that he and the victim had a consensual sexual encounter prior to her death, and thereafter, she was killed by someone else. *Id.* at 156. The Court determined, however, that the evidence was inconsistent with Petitioner's theory of innocence because "there is no record evidence to support such a consensual sexual encounter with the victim." *Id.* The Court reasoned that the medical examiner testified that the abrasions to the victim's vaginal area were evidence of forcible sex, and that although her injuries could be indicative of "very violent sex," given the nature of the abrasions, the sexual encounter would have been so painful after the injuries were inflicted that the continuation of the encounter would not have been consensual. *Id.* The Court discounted Petitioner's theory that the abrasions were cause by the victim scratching herself because the medical examiner testified that the abrasions were several layers deep and would have been painful to inflict.

*Id.*

The Court next concluded that Petitioner's theory that there was a relationship between him and the victim was not supported by the testimony. The Court relied on the testimony of Zdzislaw Raminski that the victim was Raminski's girlfriend and he was unaware that she had any other relationship, and a detective's testimony that when canvassing the neighborhood of the victim, Petitioner told the detective that he was at work and knew nothing of the incident. *Id.* Based on this evidence, the Court found that the trial court did not err in denying the motion for judgment of acquittal because the State presented competent, substantial evidence that was inconsistent with Petitioner's theory that he had consensual sex with the victim and that someone else later killed her. *Id.* The Court concluded, therefore, that there was "competent, substantial record evidence to support the jury's verdict that Darling committed premeditated murder and felony murder (based upon sexual battery)." *Id.* at 158.

"The 'critical inquiry' for § 2254 challenges to the sufficiency of the evidence supporting a state conviction 'is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Owen v. Secretary for Dept. of Corrections,* 568 F.3d 894, 918 (11th Cir. 2009) (quoting *Jackson v. Virginia,* 443 U.S. 307, 318-19 (1979)). "In weighing the sufficiency of the evidence, '[i]t is not required that the evidence rule out every hypothesis except that of guilt beyond a reasonable doubt.'" *Williams v. Allen,* 324 Fed. Appx. 756, 758 (11th Cir. 2009) (quoting *Martin v. State of*

*Alabama*, 730 F.2d 721, 724 (11th Cir. 1984)). "The Supreme Court also held that this standard 'must be applied with explicit reference to the substantive elements of the criminal offense as defined by state law.'" *Dorsey v. Burnette*, 319 Fed. Appx. 835, 840 (11th Cir. 2009) (quoting *Jackson*, 443 U.S. at 324 n.16). The federal court will not reweigh the evidence. *Jackson*, 443 U.S. at 319. The trier of fact is responsible for fairly resolving conflicts in the testimony, weighing the evidence, and drawing reasonable inferences from basic facts to ultimate facts. *Id*. Although the facts as they exist in the record may support opposing inferences, a federal habeas corpus court must presume that the state trial court jury resolved such conflicts in favor of the prosecution and against the petitioner. *See Heath v. Jones*, 863 F.2d 815, 820 (11th Cir. 1989); *Machin v. Wainwright*, 758 F.2d 1431, 1435 (11th Cir. 1985). In other words, the federal courts must defer to the judgment of the jury in assigning credibility to the witnesses and weighing the evidence. *Heath*, 863 F.2d at 820 (citing *Jackson*, 443 U.S. at 326).

In this case, the State introduced ample evidence linking Petitioner to the aggravated sexual battery and murder of the victim. Semen recovered from the victim matched Petitioner's DNA. The medical examiner testified that the injuries to the victim's vaginal area demonstrated forcible sex. The victim was found lying in the floor of her bedroom wearing only a shirt, and her underwear was found in the bathroom along with a pillow which had a gunshot hole through it. A lotion bottle containing Petitioner's fingerprint likewise was found in the bathroom. Thus, viewing the evidence in favor of the prosecution, the Court finds that the jury rationally could have determined beyond a

reasonable doubt that Petitioner murdered the victim during the course of a sexual battery. Based on the evidence introduced at trial, it is objectively reasonable to conclude that the evidence was sufficient to establish that Petitioner was guilty of committing the murder and aggravated sexual battery for which he was convicted. Accordingly, the state court decision resulted in a reasonable application of *Jackson* and its progeny. Claim one does not warrant habeas corpus relief.

**B.    Claim Two**

Petitioner asserts that his death sentence violates international treaty obligations and the Supremacy Clause of the Constitution. In support of this claim, Petitioner contends that he was not notified of his right to consular communication and access and the Commonwealth of the Bahamas was not notified of his detention as required by Article 36 of the Vienna Convention on Consular Relations and Optional Protocol Disputes[5] ("Vienna Convention"). As such, Petitioner maintains that preclusion of the death penalty is

---

[5]Article 36 of the Vienna Convention provides in pertinent part:

(b) if he so requests, the competent authorities of the receiving State shall, without delay, inform the consular post of the sending State if, within its consular district, a national of that State is arrested or committed to prison or to custody pending trial or is detained in any other manner. Any communication addressed to the consular post by the person arrested, in prison, custody or detention shall also be forwarded by the said authorities without delay. The said authorities shall inform the person concerned without delay of his rights under this sub-paragraph. . . .

Article 36(1)(b) of the Vienna Convention on Consular Relations and Optional Protocol on Disputes, Apr. 24, 1963, 21 U.S.T. 77, T.I.A.S. No. 6820.

warranted.

Petitioner raised this claim on direct appeal, and the Florida Supreme Court denied relief pursuant to *Breard v. Greene*, 523 U.S. 371 (1998). *See Darling*, 808 So. 2d at 166. Specifically, the Court determined that Petitioner failed to demonstrate that he was prejudiced by the alleged violation of the Vienna Convention. *Id*.

In *Breard*, the United States Supreme Court stated that "it is extremely doubtful that [a violation of the Vienna Convention] should result in the overturning of a final judgment of conviction without some showing that the violation had an effect on the trial." *Breard*, 523 U.S. at 377. The *Breard* Court further noted that petitioner's claim of prejudice that "had the Vienna Convention been followed, he would have accepted the State's offer to forgo the death penalty in return for a plea of guilty" was speculation and did not warrant relief. *Id*.

Subsequent to *Breard*, the Eleventh Circuit has denied habeas relief pursuant to *Breard* when the petitioner failed to demonstrate that the alleged violation of the Vienna Convention had a prejudicial effect on the trial. *See Darby v. Hawk-Sawyer*, 405 F. 3d 942, 946 (11th Cir. 2005); *see also Sanchez-Llamas v. Oregon,* 548 U.S. 331, 347 (2006) (concluding that violation of Vienna Convention does not warrant suppression of evidence).

In the instant case, Petitioner has not alleged that the purported violation of the Vienna Convention had a prejudicial impact on his trial. Instead, he simply asserts that the remedy for the alleged violation is for him not to be put to death. As noted by the United States Supreme Court in *Sanchez-Llamas*, however, "where a treaty does not provide a

particular remedy, either expressly or implicitly, it is not for the federal courts to impose one on the States through lawmaking of their own." *Sanchez-Llamas*, 548 U.S. at 347. Accordingly, the Court concludes that the state court's denial of this claim is neither contrary to, nor an unreasonable application of, clearly established federal law as determined by the United States Supreme Court.

## C.    Claim Three

Petitioner asserts that trial counsel rendered ineffective assistance in a separate criminal case, which was initiated prior to Petitioner's death penalty case. In that case (hereinafter "carjacking case"), Petitioner was charged with nine offenses, including carjacking with a firearm, robbery with a firearm, and attempted first degree murder.[6] Petitioner pled no contest to armed carjacking, robbery, and aggravated battery. As a result of Petitioner's convictions in the carjacking case, the statutory aggravator of a prior violent felony was found in Petitioner's death penalty case. Petitioner maintains that counsel in the carjacking case rendered ineffective assistance by failing to take depositions, failing to investigate a voluntary intoxication defense, permitting Petitioner to enter a plea shortly after he began representing Petitioner, and failing to file a motion to withdraw the plea. Additionally, Petitioner maintains that the state court erred by not appointing Petitioner post-conviction counsel in the carjacking post-conviction proceeding.

Petitioner, proceeding *pro se*, filed a Rule 3.850 post-conviction motion in the

_____

[6]The attorney who represented Petitioner in the carjacking case did not represent him in his death penalty case.

carjacking case, alleging that he received ineffective assistance of counsel. The state court denied Petitioner's request for appointment of counsel, conducted a hearing on the motion, and denied relief. Petitioner appealed the trial court's decision to the Fifth District Court of Appeal of Florida, which subsequently dismissed the appeal for failure to prosecute. (Ex. GGG-3 at 479.)

Thereafter, in the Rule 3.851 post-conviction proceeding in the death penalty case, Petitioner again asserted that counsel in the carjacking case rendered ineffective assistance. Pursuant to *Strickland*, the Florida Supreme Court denied this claim as follows:

> [A] review of the 3.850 evidentiary hearing in the taxi-carjacking matter, as well as the proffered testimony of Christopher Smith at the evidentiary hearing in this case, reveal that Smith's representation was not ineffective. In his 3.850 motion and at the evidentiary hearing addressing the taxi-carjacking matter, Darling alleged three bases for Smith's ineffective assistance of counsel: (1) Smith failed to investigate and prepare a voluntary intoxication defense; (2) Smith badgered Darling into accepting the plea; and (3) Smith failed to investigate the facts of the case which would have revealed that the victim could not identify Darling. With regard to the voluntary intoxication defense, Smith testified that he did not recall discussing it with Darling, and that even if he had, there would be a problem with claiming such a defense because even if the attempted first-degree murder charge, the only specific intent charge involved, was reduced downward to attempted second-degree murder, Darling still would have been facing a far greater sentence than was acquired under the plea deal. With regard to the allegation that Darling was badgered into accepting the plea, Darling's own testimony at the evidentiary hearing revealed that this allegation stemmed only from the fact that Smith correctly informed him that he would be facing twenty-two years to life if he proceeded to trial on the taxi-carjacking charges and was convicted. As to the allegation that the victim could not identify Darling, Smith confirmed this fact and said that the evidence against Darling consisted of the fact that Darling was caught with the weapon used in the crime, that a witness who knew Darling identified him as the perpetrator, and that Darling confessed to the crime. Although the trial court stated at the conclusion of the hearing that the motion would be considered as a request for mitigation of sentence, because Darling indicated that all he was

asking for was a reduction in sentence, the trial court did address the merits of Darling's ineffective assistance of counsel claim. The trial court noted that Darling had failed to prove such a claim because counsel Smith was able to acquire a plea deal for 10.5 years in the face of overwhelming evidence of Darling's guilt on charges that would have carried a sentence of twenty-two years to life.

Darling simply cannot meet his burden on either prong of the test announced in *Strickland*. Based on Smith's testimony at the evidentiary hearing in the taxi-carjacking case, his representation was not deficient on any of the points raised in Darling's 3.850 motion. Smith had a legally valid strategic reason for not asserting a voluntary intoxication defense; the defense would only have potentially reduced one of the three charges and ultimately would not have resulted in a sentence less severe than that provided by the plea bargain. Darling admitted under questioning by both the trial court and the State that his claim that Smith badgered him into accepting the plea was based only on the fact that Smith honestly informed him that he was facing twenty-two years to life if he was convicted at trial. With regard to the claim that investigation would have revealed that the victim could not identify him, Darling admitted during cross-examination that a witness who knew him prior to the crime had identified him. Even if, however, Darling had proven that Smith was deficient on any of these points, he still would have failed the prejudice prong because, as noted by the trial court during the evidentiary hearing, the evidence against Darling in the taxi-carjacking matter was overwhelming.

The appellant failed to allege any deficiency in Christopher Smith's direct representation in the taxi-carjacking case, and, therefore, there is no basis to support an argument that trial counsel in this case were ineffective for failing to intervene in the taxi-carjacking matter. Darling asserts that Smith's proffered testimony during the evidentiary hearing establishes that he was ineffective in the taxi-carjacking case. However, the United States Supreme Court has stated that a fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. *See Strickland*, 466 U.S. at 689, 104 S. Ct. 2052. Smith's testimony that had he known about the murder charge, he would have handled the case differently does not establish any deficiency in his performance because that statement was made only in hindsight and discounts Smith's perspective at the time of his representation of Darling. *See id.* Trial counsel here, Iennaco and LeBlanc, could not have been deficient for failing to intervene in a meritless

3.850 motion. Further, even if they could somehow have been deemed deficient on that basis, Darling cannot show prejudice because he has not alleged any valid avenue for attacking the plea in the taxi-carjacking case.

Darling additionally asserts that either Christopher Smith or trial counsel in this case should have filed a motion to set aside his plea on the basis that his plea form did not inform him that his conviction in the taxi-carjacking matter could be used as an aggravating factor in the subsequent murder charge. However, the plea in the taxi-carjacking matter was entered on April 3, 1997, and Darling was not even indicted in the instant case until two months later on June 12, 1997. Neither the trial court nor counsel Darling would have had reason to know that first-degree murder charges against Darling were imminent at the time of his plea colloquy. Additionally, Florida Rule of Criminal Procedure 3.172, which governs the acceptance of pleas, does not mention a required notice to defendants entering pleas that a conviction for a violent felony may be used as an aggravator in any subsequent capital murder trial.

Darling also alleges that the trial court in the taxi-carjacking matter erred in refusing his request for postconviction counsel. Claims as to trial court error in the taxi-carjacking case are beyond the jurisdiction of this Court in the present case. Darling had opportunity to appeal the trial court's determination of his rule 3.850 motion in the taxi-carjacking case to the Fifth District Court of Appeal.

* * *

Lastly, Darling asserts that this Court should exercise its habeas corpus jurisdiction to address the postconviction claims raised in the rule 3.850 motion filed in the taxi-carjacking case because Darling has not had an opportunity to have those claims addressed by a court. However, contrary to Darling's assertions, his postconviction claims in the taxi-carjacking matter were addressed by the trial court during the evidentiary hearing in that matter. As discussed, a review of both the evidentiary hearing in the taxi-carjacking case and the proffered testimony of Christopher Smith during the evidentiary hearing in the instant matter reveal that Darling's ineffective assistance of counsel claims against Smith were meritless, and their lack of merit was addressed by Judge MacKinnon during the evidentiary hearing in the taxi-carjacking matter. Therefore, there is no reason for this Court to exercise its jurisdiction under the extraordinary writ of habeas corpus on this matter.

*Darling,* 966 So. 2d at 379-81.

Petitioner has failed to demonstrate that the state court's determination is either contrary to, or an unreasonable application of, *Strickland* or an unreasonable determination of the facts in light of the evidence presented. The record demonstrates that in the carjacking case, Petitioner was charged with nine offenses, including carjacking with a firearm, robbery with a firearm, and attempted first degree murder. (Ex. GGG-3 at 407; Ex. G-1 at 44.) Petitioner had admitted to detectives after being advised of his *Miranda*[7] rights that he called a taxicab for a ride, entered the vehicle, robbed the cab-driver, shot him, and then took the taxicab. *Id.* 505-19. Petitioner stated that he was attempting to get money to purchase marijuana, and he indicated that marijuana and alcohol were the only drugs he used. *Id.* at 508. A witness who knew Petitioner identified Petitioner as the person who was in the back of the taxicab and who subsequently drove away in the vehicle at the time of the offense. *Id.* at 520-25.

Christopher Smith ("Smith") entered a notice of appearance as Petitioner's attorney in the carjacking case on February 10, 1997. *Id.* at 404. On April 4, 1997, Petitioner entered a plea of no contest to carjacking with a firearm, robbery, and aggravated battery. *Id.* at 413, 424-32. Petitioner was not charged in the death penalty case until June 1997, and he was not arrested until August 1997. Thus, at the time of his plea in the carjacking case, Petitioner had not been charged in the instant case, and Smith was unaware of the death penalty case at the time he represented Petitioner.

---

[7]*Miranda v. Arizona*, 384 U.S. 436 (1966).

Furthermore, during the plea hearing in the carjacking case, Petitioner indicated that no one had pressured him or threatened him to enter his plea, and he was satisfied with Smith's representation. *Id.* at 426-28. Pursuant to the plea agreement, the state court sentenced Petitioner to a 10.5 year term of imprisonment. *Id.*

At the Rule 3.850 evidentiary hearing in the carjacking case, Petitioner testified he told Smith prior to entering his plea that he was under the influence of drugs when he committed the offense and when he gave his statement to the police. (Ex. G-1 at 20, 25-26, 30-32.) Petitioner stated that the day before entering the plea he asked Smith if he could get him a sentence as a youthful offender and that Smith told him that if he proceeded to trial and was found guilty, Petitioner was subject to a sentence of twenty-two years to life in prison. *Id.* at 38-42. Petitioner testified that the victim had been unable to identify Petitioner until after Petitioner was in custody. *Id.* at 54.

Smith testified at the Rule 3.850 evidentiary hearing in the carjacking case that he conducted discovery prior to Petitioner entering his plea. *Id.* at 56. He indicated that the evidence against Petitioner included an eyewitness identification of Petitioner, Petitioner's possession of the firearm used in the offense, and Petitioner's confession to detectives. *Id.* at 57. Smith could not recall discussing the defense of voluntary intoxication with Petitioner, but he indicated that the defense would not have been available to some of the charges which were not specific intent crimes. *Id.* at 57-58. Thus, the defense of voluntary intoxication would not have served as a defense to the charge of attempted first degree murder, and if convicted by a jury of either attempted first or second degree murder,

Petitioner would have been subject to a greater sentence than he received by entering the plea. *Id.* at 58-59. Smith further testified that Petitioner's focus was on Smith obtaining a plea offer of eight years or less. *Id.* at 61-62. Finally, Smith indicated that he was aware that there was a question of whether the victim could identify Petitioner, but another witness who knew Petitioner had identified him and Petitioner was found with the gun in his possession. *Id.* at 64-65. At the conclusion of the hearing, the state court determined that Petitioner failed to demonstrate that counsel was ineffective because the evidence against Petitioner was overwhelming and counsel had succeeded in getting the State to allow Petitioner to plead to the lesser included offenses of robbery and aggravated battery and to agree to a sentence at the bottom of the guidelines. *Id.* at 70-71.

In light of the information known by Smith and Petitioner at the time Petitioner entered his plea, the Court cannot conclude that counsel's performance was deficient or that a reasonable probability exists that but for counsel's performance, Petitioner would not have pleaded guilty and would have insisted on proceeding to trial. Neither counsel nor Petitioner was aware at the time of the plea of the death penalty case. According to Smith, Petitioner's focus at the time he entered the plea was on obtaining a sentence less than eight years, and counsel was able to obtain a plea to lesser included offenses and a substantially lesser sentence than the sentence to which Petitioner was subject. (Ex. G-5 at 922.) Thus, no basis existed for Smith to seek to withdraw the plea at that time. Furthermore, even assuming that Smith had been successful in suppressing Petitioner's confession, an eyewitness had identified Petitioner as the individual in the taxicab at the

scene of the offense and the gun used during the offense was found in Petitioner's possession. Finally, to the extent Petitioner asserts that he is entitled to habeas relief because he was not afforded post-conviction counsel in the carjacking case, the United States Supreme Court has held that a defendant has no federal constitutional right to post-conviction counsel. *See Pennsylvania v. Finley*, 481 U.S. 551, 555, (1987); *see also Murray v. Giarratano*, 492 U.S. 1, 12 (1989) (holding that *Finley* applies to those inmates under sentence of death as well as to other inmates). Moreover, Petitioner had not been tried in the death penalty case at the time of the Rule 3.850 proceeding in the carjacking case. Thus, the state court's denial of Petitioner's motion to appoint post-conviction counsel is neither contrary to, or an unreasonable application, of clearly established law. For all of the foregoing reasons, this claim is denied pursuant to § 2254(d).

## D.    Claim Four

Petitioner asserts that appellate counsel rendered ineffective assistance by failing to raise five claims on direct appeal related to the constitutionality of the Florida death penalty statute. The five claims are as follows:

1. The aggravating circumstance of murder during the commission of an enumerated felony (sexual battery) is unconstitutional. This aggravating circumstance is an inherent element of the conviction and constitutes, therefore, an "automatic" aggravating circumstance;

2. Section 921.141, Florida Statutes is unconstitutional because only a bare majority of the jury is sufficient to recommend death;

3. The jury in the penalty phase should have been required to furnish findings of fact. This means that the jury would have been required to reach some form of agreement as to the aggravating or mitigating circumstances which were found;

4.      Section 921.141, Florida Statutes is unconstitutional for failure to provide the jury adequate guidance in the finding of sentencing circumstances; and

5.      The State should have been compelled, by way of a statement of particulars, to notify the defendant what aggravating circumstances the State intended to prove at [the] penalty phase.

(Doc. No. 1 at 22.)

Petitioner raised this claim in his state habeas petition. The Florida Supreme Court determined that Petitioner failed to demonstrate ineffective assistance pursuant to *Strickland* because the substantive claims underlying the ineffective assistance of counsel claims had been denied in previous cases, and as such, counsel was not deficient for failing to raise non-meritorious claims. *Darling*, 966 So. 2d at 386-87.

In order to determine whether Petitioner's counsel rendered ineffective assistance by failing to appeal Petitioner's sentence on these grounds, the Court must examine the merits of the arguments Petitioner alleges his counsel failed to raise. *See Miller v. Dugger*, 858 F.2d 1536, 1538 (11th Cir. 1988); *Alvord v. Wainwright*, 725 F.2d 1282, 1291 (11th Cir. 1984). Appellate counsel is not ineffective for failing to raise claims "reasonably considered to be without merit." *Id.*

The first claim Petitioner maintains that appellate counsel failed to raise on direct appeal has been deemed to be without merit by the Eleventh Circuit and Florida courts. *See, e.g., Mills v. Singletary*, 161 F.3d 1273, 1287 (11th Cir. 1998) (noting that claim that felony murder aggravator was an unconstitutional automatic aggravator is without merit as determined in *Johnson v. Dugger*, 932 F.2d 1360, 1368-70 (11th Cir. 1991)); *see also Banks v.*

*State*, 700 So. 2d 363, 367 (Fla. 1997). As such, appellate counsel cannot be deemed ineffective for failing to raise this issue.

The remaining four claims Petitioner asserts appellate counsel should have raised on direct appeal are premised on *Ring v. Arizona*, 536 U.S. 584 (2002), and *Apprendi v. New Jersey*, 530 U.S. 466 (2000). In *Apprendi*, the Court held that, "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." *Apprendi*, 530 U.S. at 490. Subsequently, on June 24, 2002, the Court in *Ring v. Arizona*, 536 U.S. 584 (2002), expanded its ruling in *Apprendi* to the context of capital punishment and held that aggravating factors that justify an increase in the maximum punishment for first degree murder from life imprisonment to death become elements of a greater offense and must be found to exist beyond a reasonable doubt by a jury. *Ring*, 536 U.S. at 609. However, neither *Apprendi* nor *Ring* applies retroactively to cases that were already final on direct appeal at the time those decisions were rendered. *See Schriro v. Summerlin*, 542 U.S. 348, 358 (2004); *see also Zeigler v. Crosby*, 345 F.3d 1300, 1312 n.12 (11th Cir. 2003) (noting that "neither *Apprendi* nor *Ring* applies retroactively on collateral review to convictions that became final before they were decided.").

In the instant case, Petitioner's case became final on direct appeal on May 13, 2002, prior to the United States Supreme Court's decision in *Ring*. Therefore, at the time Petitioner's conviction became final *Ring* had not been decided. Eleventh Circuit precedent prohibits any argument "that an attorney's failure to anticipate a change in the law

constitutes ineffective assistance of counsel." *United States v. Ardley*, 273 F.3d 991, 993 (11th Cir. 2001).

"Furthermore, the Florida capital sentencing procedures do not create the Sixth Amendment error identified in *Ring*." *Grossman v. Crosby*, 359 F. Supp. 2d 1233, 1284 (M.D. Fla. 2005). While *Ring* makes *Apprendi* applicable to death penalty cases, the Florida Supreme Court has expressly recognized that the maximum penalty for first degree murder under Florida's statutory scheme is death. *See Porter v. Crosby*, 840 So. 2d 981, 986 (Fla. 2003); *Shere v. Moore*, 830 So. 2d 56, 61 (Fla. 2002) ("This court has defined a capital felony to be one where the maximum possible punishment is death."); *Mills v. Moore*, 786 So. 2d 532, 536-68 (Fla. 2001). Thus, "unlike Arizona, a Florida defendant is eligible for the death penalty upon conviction for first degree murder." *Grossman*, 359 F. Supp. 2d at 1284. As such, the Florida Supreme Court has rejected numerous *Ring* challenges, consistently finding that Florida's sentencing scheme comports with the Sixth Amendment. *See Kormondy v. State*, 845 So. 2d 41, 54 (Fla. 2003) (*Ring* does not encompass Florida procedures or require either notice of the aggravating factors that the State will present at sentencing or a special verdict form indicating the aggravating factors found by the jury); *Bottoson v. Moore*, 833 So. 2d 693 (Fla. 2002); *King v. Moore*, 831 So. 2d 143 (Fla. 2002). Because neither *Apprendi* nor *Ring* requires a finding that the Florida capital sentencing scheme is unconstitutional, Petitioner has failed to demonstrate that appellate counsel was deficient for failing to raise these claims on appeal or that he was prejudiced by counsel's failure to do so. *See, e.g., Hannon v. Dep't of Corr.,* 622 F. Supp. 2d 1169, 1228-29 (M.D. Fla. 2007).

Additionally, the Court notes that the Supreme Court has determined that the Florida capital sentencing scheme is constitutional. *See Hildwin v. Florida*, 490 U.S. 638, 638-41 (1989) (finding no Sixth Amendment violation where specific findings that authorize the imposition of capital punishment were not made by the jury); *Spaziano v. Florida*, 468 U.S. 447 (1984); *see also Apodaca v. Oregon*, 406 U.S. 404, 406 (1972); *Mansfield v. Secretary, Dept. of Corr.*, 601 F. Supp. 2d 1267 (M.D. Fla. 2009); *Franqui v. Florida*, 2008 WL 2747093, 24 (S.D. Fla. 2008). Accordingly, the Court concludes that appellate counsel was not ineffective for failing to raise these claims on direct appeal, and this claim is denied pursuant to § 2254(d).

## E.   Claim Five

Petitioner asserts that lethal injection is cruel and unusual punishment pursuant to the Eighth Amendment to the United States Constitution. Petitioner raised this claim in the state courts, and the Florida Supreme Court denied relief. *Darling*, 966 So. 2d at 387-88. In denying the claim, the court relied on *Hill v. State*, 921 So. 2d 579, 583 (Fla. 2006), wherein the Florida Supreme Court reiterated that Florida's lethal injection protocol does not result in cruel and unusual punishment. *Id.*

In *Baze v. Rees*, 553 U.S. 35, 128 S. Ct. 1520, 1529 (2008), the United States Supreme Court determined that Kentucky's lethal injection protocol, which uses the same combination of the three drugs utilized by Florida's lethal injection protocol, satisfies the Eighth Amendment prohibition against cruel and unusual punishment. The *Baze* Court summarized Kentucky's lethal injection protocol as follows:

> Kentucky's protocol called for the injection of 2 grams of sodium thiopental, 50 milligrams of pancuronium bromide, and 240 milliequivalents of

potassium chloride. In 2004, as a result of this litigation, the department chose to increase the amount of sodium thiopental from 2 grams to 3 grams. App. 762-763, 768. Between injections, members of the execution team flush the intravenous (IV) lines with 25 milligrams of saline to prevent clogging of the lines by precipitates that may form when residual sodium thiopental comes into contact with pancuronium bromide. *Id.*, at 761, 763-764. The protocol reserves responsibility for inserting the IV catheters to qualified personnel having at least one year of professional experience. *Id.*, at 984. Currently, Kentucky uses a certified phlebotomist and an emergency medical technician (EMT) to perform the venipunctures necessary for the catheters. *Id.*, at 761-762. They have up to one hour to establish both primary and secondary peripheral intravenous sites in the arm, hand, leg, or foot of the inmate. *Id.*, at 975-976. Other personnel are responsible for mixing the solutions containing the three drugs and loading them into syringes. *Id.*, at 761.

Kentucky's execution facilities consist of the execution chamber, a control room separated by a one-way window, and a witness room. *Id.*, at 203. The warden and deputy warden remain in the execution chamber with the prisoner, who is strapped to a gurney. The execution team administers the drugs remotely from the control room through five feet of IV tubing. *Id.*, at 286. If, as determined by the warden and deputy warden through visual inspection, the prisoner is not unconscious within 60 seconds following the delivery of the sodium thiopental to the primary IV site, a new 3-gram dose of thiopental is administered to the secondary site before injecting the pancuronium and potassium chloride. *Id.*, at 978-979. In addition to assuring that the first dose of thiopental is successfully administered, the warden and deputy warden also watch for any problems with the IV catheters and tubing.

*Id.* at 1528.

In *Sims v. State*, 754 So. 2d 657, 666 n.17 (Fla. 2000), the Florida Supreme Court

outlined Florida's lethal injection protocol as follows:

On the morning of the execution, the inmate will receive a physical examination, be given a Valium if necessary to calm anxiety, and will receive his or her last meal. Next, the inmate will be taken to the execution room where he will be strapped to a gurney and placed on a heart monitor. The inmate will then be injected with two IV's containing saline solution. He will then be escorted into the execution chamber where the witnesses will be able

to view the execution. While the inmate is being prepared, a pharmacist will prepare the lethal substances. In all, a total of eight syringes will be used, each of which will be injected in a consecutive order into the IV tube attached to the inmate. The first two syringes will contain "no less than" two grams of sodium pentothal, an ultra-short-acting barbiturate which renders the inmate unconscious. The third syringe will contain a saline solution to act as a flushing agent. The fourth and fifth syringes will contain no less than fifty milligrams of pancuronium bromide, which paralyzes the muscles. The sixth syringe will contain saline, again as a flushing agent. Finally, the seventh and eighth syringes will contain no less than one-hundred-fifty milliequivalents of potassium chloride, which stops the heart from beating. Each syringe will be numbered to ensure that they are injected into the IV tube in the proper order. A physician will stand behind the executioner while the chemicals are being injected. The physician's assistance [sic] will also observe the execution and will certify the inmate's death upon completion of the execution.

Thereafter, in *Lightbourne v. McCollum*, 969 So. 2d 326, 345 n.20 (Fla. 2007), the Florida Supreme Court noted that "Florida's protocols now direct that an inmate be given five grams of sodium pentothal." Furthermore, Florida's lethal injection protocol effective August 2007 requires:

[T]he warden to "assess whether the inmate is unconscious" after injection of the two syringes of sodium pentothal and the first saline syringe. If the inmate is not determined to be unconscious at that point, the warden shall suspend the execution process, order the window closed, and consider a secondary access site. The August 2007 procedures make clear that the process of assessing consciousness is a critical step that must be conducted before the execution proceeds. The August 2007 procedures state that the warden makes the determination of consciousness "after consultation."

*Id*. at 346 (footnote omitted). Thus, the Florida lethal injection protocol is similar to the one used by Kentucky which was deemed to be constitutional in *Baze*. As such, to the extent that claim six has been exhausted, the Court concludes that Petitioner has failed to demonstrate that the state court's denial of this claim was contrary to, or an unreasonable

application of, clearly established federal law.[8]  *See, e.g., Ventura v. State*, 2 So. 3d 194, 200

(Fla. 2009) (concluding that "Florida's current lethal-injection protocol passes muster under

any of the risk-based standards considered by the *Baze* Court").  Accordingly, this claim

is denied pursuant to § 2254(d).

**F.      Claim Six**

Petitioner contends that he may be incompetent at the time he is scheduled to be

executed, and therefore his execution would violate the Eighth Amendment.  Petitioner

raised this claim in the state courts, and the Florida Supreme Court denied the claim

because it was not ripe.  *See Darling*, 966 So. 2d at 387-88.  The United States Supreme Court

had held that a *Ford*[9] claim does not become ripe until the prisoner's execution is imminent.

*See Panetti v. Quarterman*, 127 S. Ct. 2842, 2854-55 (2007).  Thus, claim six is dismissed

without prejudice to Petitioner's right to raise it again when the issue becomes ripe for

adjudication.

---

[8]Petitioner raised this claim in his state habeas petition, and the Florida Supreme Court denied the claim.  Petitioner subsequently filed another action in the state courts based on the execution of Angel Diaz, asserting that Florida's use of lethal injection constitutes cruel and unusual punishment.  After Respondents in this case filed their Response to the Petition (Doc. No. 14), Petitioner filed a motion to amend the habeas petition and to hold the proceedings in abeyance based on the pending state court proceeding regarding the constitutionality of Florida's lethal injection protocol. (Doc. No. 18.)  This Court denied the motion to amend and to hold the proceedings in abeyance.  *See* Doc. No. 21.

[9]*Ford v. Wainwright*, 477 U.S. 399 (1986) (holding that "the Eighth Amendment prohibits a State from carrying out a sentence of death upon a prisoner who is insane.").

**G.    Claim Seven**

Petitioner asserts that trial counsel failed to adequately investigate and present mitigating evidence.  Petitioner argues generally that counsel failed to present evidence demonstrating the abuse he suffered as a juvenile and evidence demonstrating that he suffers from frontal lobe brain damage which would qualify him for application of statutory mental health mitigators.

Petitioner raised this claim in his Rule 3.851 motion, and the state court conducted a hearing on the claim after which it denied relief.  The Florida Supreme Court affirmed the state trial court's decision.  In so ruling, the Florida Supreme Court determined pursuant to *Strickland* that Petitioner failed to demonstrate that counsel's performance was deficient because the investigation and presentation of mitigation evidence was legally sufficient. *See Darling*, 966 So. 2d at 377-78.  The Court reasoned that the evidence presented during the post-conviction evidentiary hearing was generally "a more detailed presentation of the mitigation that was actually presented during the penalty phase." *Id.* at 377.  The Court addressed Petitioner's individual arguments as follows:

> Darling argues that trial counsel was ineffective in failing to order a neuropsychological assessment when there was a clear indication in the records relating to Darling's life and from interviews with various witnesses that Darling may suffer from brain damage.  During the evidentiary hearing, Marjorie Hammock stated that although she was admittedly not qualified to diagnose brain damage, the multiple head injuries, severe beatings, nosebleeds, headaches, and stuttering experienced by Darling as a child might give some indication of neurological damage.  Dr. Henry Dee was of the view that Darling did suffer from frontal lobe damage.  However, in preparing for the penalty phase, trial counsel relied on the evaluation of psychiatric expert Dr. Michael Hercov [sic].  Darling's trial counsel confirmed that he relied on the evaluation performed by his expert, Dr. Hercov [sic],

35

and would not have ordered a neuropsychological evaluation absent a recommendation by Dr. Hercov [sic]. Also, Dr. David Frank established during the evidentiary hearing that Darling's irritability and changed behavior was the result of being abused rather than organic brain damage. Dr. Frank added that stuttering after being abused is a normal response produced by fear and anxiety. Dr. Frank also added that Darling's impulsivity, frequent fights, and poor planning were all indicative of the diagnosis that Darling had antisocial personality disorder.

This Court has established that defense counsel is entitled to rely on the evaluations conducted by qualified mental health experts, even if, in retrospect, those evaluations may not have been as complete as others may desire. *See State v. Sireci*, 502 So. 2d 1221, 1223 (Fla. 1987). Even if the evaluation by Dr. Hercov [sic], which found no indication of brain damage to warrant a neuropsychological workup, was somehow incomplete or deficient in the opinion of others, trial counsel would not be rendered ineffective for relying on Dr. Hercov's [sic] qualified expert evaluation. *See id.* Therefore, trial counsel was not ineffective for failing to order a neuropsychological evaluation.

Although Darling further asserts that trial counsel was also ineffective for failing to present the testimony of Darling's father, Carlton, during the penalty phase, as noted by the trial court, the substance of Carlton's testimony was actually presented through other witnesses during the penalty phase. Dr. Hercov [sic] and Darling's mother and sister testified during the penalty phase with regard to the abuse Darling suffered at the hands of Carlton. Although as an afterthought Carlton provided a more detailed account with regard to the abuse, this Court has held that even if alternate witnesses could provide more detailed testimony, trial counsel is not ineffective for failing to present cumulative evidence. *See Gudinas v. State*, 816 So. 2d 1095, 1106 (Fla. 2002); *Sweet v. State*, 810 So. 2d 854, 863-64 (Fla. 2002). Therefore, trial counsel was not ineffective for failing to call Carlton as a witness during the penalty phase to present evidence which was generally presented by others.

The trial court noted in the order denying postconviction relief that the testimony of Mario Smith, Lance McIntosh, Montico Rahming, and Marjorie Hammock with regard to the conditions at Foxhill prison "was really a general comment on existing conditions, and did not conclusively establish that Defendant was beaten while incarcerated there." Although trial counsel failed to locate and present the testimony of three of these witnesses at the penalty phase, trial counsel cannot be deemed deficient for

failing to present mitigation not supported by the record. Additionally, even if trial counsel could be deemed deficient for failing to attempt to establish this mitigation, Darling cannot establish prejudice on this point because the trial court found that the evidentiary hearing testimony in this regard was inconclusive.

With regard to the testimony of psychiatric expert Dr. Mark Cunningham, contrary to Darling's assertions, the trial court did not dismiss or discount Dr. Cunningham's testimony. Instead, the trial court simply held that "Dr. Cunningham's testimony added little or nothing new; instead, it was merely a 'cumulative analysis' of the testimony previously presented at the penalty phase." A review of both the penalty phase and evidentiary hearing transcripts reveals that the trial court has accurately characterized Dr. Cunningham's testimony. Although Dr. Cunningham presented various elements from Darling's background in four colorfully named categories, a review of his testimony reveals that many of the individually identified mitigating factors discussed by Dr. Cunningham were redundant and cumulative of evidence presented during the penalty phase. For example, Dr. Cunningham listed mitigating factors relating to Carlton Darling's emotional and physical abuse of both Darling and his mother as six different factors listed under three of the four broad categories of mitigation identified by Dr. Cunningham. The trial court accurately identified this evidence as cumulative. In addition to being cumulative, as discussed above, the testimony of Dr. Cunningham was also redundant, and Dr. Cunningham simply restated the same mitigation numerous times in slightly varying manners. As noted, trial counsel is not ineffective for failing to present cumulative evidence. *See Gudinas*, 816 So. 2d at 1106; *Sweet*, 810 So. 2d at 863-64. To the extent that anything presented by Dr. Cunningham may not have been cumulative of evidence presented during the penalty phase, this Court has stated that "[c]ounsel cannot be deemed ineffective . . . simply because he relied on what may have been a less than complete pretrial psychiatric evaluations." *Sireci*, 502 So. 2d at 1223. Trial counsel was not deficient by relying on the psychiatric evaluation of a qualified expert, Dr. Hercov.

Therefore, although Darling did present additional witnesses during the evidentiary hearing who testified with regard to his background with somewhat greater specificity than that presented during the penalty phase, trial counsel was not ineffective for failing to present this largely cumulative evidence. Additionally, to the extent that any of the evidence relating to Darling's mental health and brain functions was not cumulative, trial counsel was not ineffective for relying on the evaluation by a qualified expert.

> Darling has failed with regard to this claim to establish ineffective assistance of trial counsel during the penalty phase under the *Strickland* analysis.

*Darling*, 966 So. 2d at 377-78.

To determine whether counsel's performance was lacking at the penalty phase, courts must consider "'whether counsel reasonably investigated possible mitigating factors and made a reasonable effort to present mitigating evidence to the sentencing court.'" *Stewart v. Secretary, Dept. of Corrections,* 476 F.3d 1193, 1209 (11th Cir. 2007) (quoting *Henyard v. McDonough*, 459 F.3d 1217, 1242 (11th Cir. 2006)). "[C]ounsel's decision not to investigate and develop favorable evidence must be reasonable and fall within the range of professionally competent assistance. Strategic choices to forego further investigation into an issue are not deficient when a reasonable professional judgment based on a sufficient initial inquiry supports the decision to terminate the investigation." *Lynd v. Terry*, 470 F. 3d 1308, 1316-17 (11th Cir. 2006) (citing *Strickland*, 466 U.S. at 690-91). Counsel is deficient when he or she "'totally fails to inquire into the defendant's past or present behavior or life history' in a capital case. . . ." *Lynd*, 470 F.3d at 1317 (quoting *Housel v. Head*, 238 F.3d 1289, 1294 (11th Cir. 2001)); *see also Jackson v. Herring*, 42 F.3d 1350, 1367 (11th Cir. 1995) (holding that representation is deficient when counsel does not conduct sufficient investigation to formulate an adequate life profile of a defendant).

"To determine prejudice from the unreasonable failure to investigate and present favorable and/or mitigating evidence, '[federal courts] reweigh the evidence in aggravation against the totality of available mitigating evidence.'" *Ward v. Hall*, 592 F.3d 1144, 1165 (11th Cir. 2010) (quoting *Wiggins v. Smith,* 539 U.S. 510, 534 (2003)). The Court

must "evaluate the totality of the available mitigation evidence – both that presented at trial and at the collateral proceedings." *Id.* (citing *Williams,* 529 U.S. at 397-98). "If 'the available mitigating evidence, taken as a whole, 'might well have influenced the jury's appraisal' of [the defendant's] moral culpability,' *Wiggins*, 539 U.S. at 538, then prejudice has been shown." *Id.*

Because this issue was adjudicated on the merits in the state court, this Court may grant habeas corpus relief only if the state court's decision "was contrary to, or involved an unreasonable application of, clearly established Federal law" or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings." 28 U.S.C. § 2254(d)(1) and (2). The Court is cognizant that it may not substitute its judgment on this issue for judgments made by the state courts. *See Woodford v. Visciotti*, 537 U.S. 1149 (2003) (reversing appellate court's rejection of state court's finding that petitioner was not prejudiced by his counsel's failure to present mitigation evidence at the penalty phase of his trial). This Court may not grant the writ simply because it determines that the state court erroneously or incorrectly applied the correct governing law. *Bell*, 535 U.S. at 694. Relief is only warranted if the state court's application was objectively unreasonable. *Id.*

i.      *Penalty Phase Evidence*

During the penalty phase, the State presented evidence of a prior violent felony conviction involving the use or threat of violence, *i.e.*, the robbery and shooting of a taxicab driver, Gerald Paul Daigneault ("Daigneault"). Daigneault testified that he had been

robbed at gunpoint by Darling after picking him up as a passenger. (Ex. A-1 at 30-32.) Daigneault indicated that Petitioner placed a gun to the back of his head, and even though Daigneault complied with Petitioner's demands, Petitioner shot him in the back of the head. *Id*. at 32.

The defense presented Deshane Claer ("Claer"), Petitioner's girlfriend and the mother of his child, as a witness during the penalty phase. (Ex. A-2 at 62-73.) Claer testified that Petitioner maintained contact with her after coming to the United States and that he expressed concern for their daughter. *Id*. at 72.

Verneki Butler ("Butler"), Petitioner's sister, also testified. Butler indicated that she is ten years older than Petitioner and she left home when she was sixteen years old to attend college. (Ex. A-2 at 75,79.) Butler stated that her parents never married, but lived together throughout her and Petitioner's childhood. (Ex. A-2 at 74-77.) Butler testified that Carlton was physically, emotionally, and verbally abusive to her mother and Petitioner. *Id*. at 76-77, 84. She further indicated that Carlton drank excessively and engaged in numerous affairs with other women when she and Petitioner were growing up. *Id*. at 77-78, 89. Butler said that Carlton did not emotionally support them. *Id*. at 84. Butler also indicated that she blamed her mother in part for not taking a stand against her father and staying in the relationship, thereby allowing her and Petitioner to be damaged emotionally. *Id*. at 88. She testified that she observed Carlton beat Petitioner, who was sleeping, with a PVC pipe. *Id*. at 84. Butler also stated that Carlton would beat Petitioner when he tried to break up fights between Carlton and their mother, and she recalled an incident when

Petitioner was in first grade and Carlton beat him with a coat hanger because he had to wait five minutes on Petitioner. *Id.* at 92-93, 96. Butler testified that as a result of her childhood environment she battles alcoholism and depression. *Id.* at 98.

Petitioner's mother, Eleanor Bessie Smith ("Ms. Smith"), testified during the penalty phase. (Ex. A-2 at 99-115.) She stated that Carlton was an alcoholic, was physically and verbally abusive, and carried on relationships with other women. *Id.* at 101-02, 105. Ms. Smith indicated that Petitioner was hit by Carlton on many occasions while trying to defend her. *Id.* at 104.

Dr. Michael Herkov, a forensic psychologist, testified that he conducted a clinical interview of Petitioner; reviewed the State's discovery material; reviewed the forensic reports; consulted with an investigator; spoke with counsel several times; interviewed Petitioner's sister, mother, girlfriend, and half-sister; conducted psychological tests on Petitioner; reviewed Petitioner's school records; reviewed Carlton's deposition testimony; reviewed the statement of Harlan Dean, a headmaster at one of Petitioner's schools; and reviewed the statement of Deborah Rolle. *Id.* at 115, 119-21. Dr. Herkov indicated that Carlton was an alcoholic and that Carlton beat Petitioner with a PVC pipe, a hanger, a curtain rod, a club and with his hand. *Id.* at 122-25, 166. Dr. Herkov testified that Carlton beat Petitioner on a monthly basis starting from the age of nine, that Petitioner observed Carlton abuse Ms. Smith, and that when Petitioner tried to protect Ms. Smith, he would be hit. *Id.* at 123-25. Dr. Herkov stated that Petitioner had to receive medical care after one of Carlton's beatings. *Id.* at 126-28. Dr. Herkov noted that Carlton was also physically

abused by his father and there was a generational cycle of violence. *Id*. 128-30. He noted that Petitioner suffered extreme physical abuse as a child. *Id*. at 122-25. Dr. Herkov explained that the type of abuse suffered by Petitioner would result in him learning that violence is an acceptable way to deal with conflict and would desensitize him to violence. *Id*. at 130-31. He also opined that such physical abuse results more commonly in the victim of the abuse exhibiting antisocial behaviors such as criminal activity. *Id*. at 126-27.

Dr. Herkov indicated that Petitioner's school records demonstrated that he had a lack of progression and difficulty in school, which is an expected result of the type of abuse suffered by Petitioner. *Id*. at 133-35. He further stated that Petitioner's school records supported a finding that Petitioner suffers from a learning disability. *Id*. at 137. Dr. Herkov also indicated that Petitioner had a history of sexual abuse. *Id*. at 136.

ii.     *Rule 3.851 Evidentiary Hearing*

At the Rule 3.851 evidentiary hearing, Carlton Darling ("Carlton") testified that he and Petitioner's mother, Eleanor Smith, were never married; that his contact with Petitioner was limited primarily to picking him up from school; that he beat Petitioner approximately six times per week; that he had a drinking problem; that he physically abused Petitioner's mother; and that he took Petitioner to the cabaret at which he worked approximately six times and scantily clad women could be observed by Petitioner. (Ex. G-1 at 139-72.) Carlton stated that he beat Petitioner with his fists and PVC generally around Petitioner's head. Carlton indicated that the last time he beat Petitioner, when Petitioner was approximately sixteen years old, Petitioner's nose bled. *Id*. at 146-47, 153-54. Carlton

testified that when Petitioner was approximately seven or eight years old he was beaten up by children in the neighborhood to the point of unconsciousness and the beating caused him to bleed from his nose. *Id*. at 159-60. Carlton stated that beginning around the age of fourteen Petitioner would stutter after he would beat Petitioner. *Id*. at 162, 168. Carlton indicated that he was contacted prior to Petitioner's trial, that his deposition was taken, and that he was told that he may be called as a witness, but he was never contacted thereafter. *Id*. at 139. Carlton stated that he had been willing to testify at trial for Petitioner. *Id*. at 155.

Mario Smith ("Smith"), Petitioner's cousin, testified at the evidentiary hearing that he worked as a prison guard at the Fox Hill Prison in the Bahamas when Petitioner, who was approximately seventeen years old, was a prisoner at the facility. (Ex. G-2 at 203-04, 210.) Smith indicated that the conditions at the prison were unsanitary, overcrowded, and substandard. *Id*. at 204-13, 228. Smith stated that prison guards at the prison would regularly beat prisoners and that prisoners frequently assaulted each other. *Id*. at 215-18. Smith testified that he never observed Petitioner being beaten by the prison guards and Petitioner never complained to him that he had been beaten. *Id*. at 219-20.

Lance McIntosh ("McIntosh"), Petitioner's friend, provided deposition testimony. McIntosh indicated that Petitioner was a nice person and was like a brother to him. (Ex. GGG-1 at 31.) McIntosh described Petitioner as dependable. *Id*. at 65. McIntosh testified that growing up in the Bahamas was difficult, that drugs were commonly used and easy to obtain, and that he and Petitioner joined a gang to cope with life in the Bahamas. *Id*. at 31-34. McIntosh indicated that Petitioner smoked marijuana frequently. *Id*. at 32.

McIntosh testified that he saw Petitioner being beaten by the police when Petitioner failed to provide them with information. *Id*. at 34-36. McIntosh was also incarcerated at Fox Hill Prison, but not at the same time as Petitioner, and he described the prison's conditions in a similar manner as Smith. *Id*. at 44-48. McIntosh said that Petitioner told him when discussing prison that he could not go back there. *Id*. at 49, 75-76.

Montico Rahming ("Rahming"), also Petitioner's friend, testified during a deposition that Petitioner was considerate and giving. *Id*. at 94-95. Rahming was in a cell next to Petitioner at Fox Hill Prison, and he indicated that guards went into Petitioner's cell and beat him although he could not see it. *Id*. at 87, 91.

Marjorie Hammock ("Hammock"), a clinical social worker, testified at the evidentiary hearing as to her biopsychosocial assessment of Petitioner based on interviews of Petitioner, his family members, and friends; Petitioner's school records; the psychological and neuropsychological evaluations of Drs. Henry Dee ("Dr. Dee") and Mark Cunningham ("Dr. Cunningham"); and her visit to the Bahamas. (Ex. G-2 at 230-38.) Hammock indicated that Petitioner had a history of head injuries in his early adolescence from beatings and from bicycle wrecks, lost consciousness on two such occasions, suffered frequent nosebleeds and headaches, stuttered when under stress, was physically abused by his father, and was somewhat emotionally abused by his mother and father. *Id* at 243-44, 253-55. Hammock opined that Petitioner was not a good student and may have had some learning problems. *Id*. at 244-45, 249-50. She testified that Petitioner was sent to a boys industrial home, a juvenile facility, in seventh grade based on misbehavior, and while

there, he may have been sexually abused by a male administrator. *Id*. at 255-58. Hammock stated that Petitioner was in a gang for protection and began using alcohol and marijuana when he was about twelve years old. *Id*. at 259-61. Hammock indicated that Petitioner used marijuana daily and crack cocaine every other day. *Id*. at 261. She opined that Petitioner had no safe place growing up, his home life was very unhealthy, and he had few sustaining relationships growing up. *Id*. at 264-68, 286.

Dr. Cunningham, a clinical and forensic psychologist, also testified at the evidentiary hearing. *Id*. at 361. Dr. Cunningham's testimony was premised in part on his interview of Petitioner, Petitioner's parents, and Smith; Dr. Dee's reports and deposition testimony; the penalty phase testimony of Deshane Claer, Dr. Herkov, and Petitioner's mother and sister; and Petitioner's school records. *Id.* at 380-83. Dr. Cunningham identified four primary areas of mitigating factors pertinent to Petitioner's case: (1) "faulty wiring" in that "there is some evidence of neuropsychological cognitive dysfunction" as shown by learning difficulties, school failure, head injuries, teen drug dependency, genetic predisposition for drug dependency, and explosive temper; (2) "parental poisoning" based on "dysfunctional family scripts" as evidenced by circumstances such as generational family history with regard to relationships and physical abuse and emotional neglect; (3) "sexual poisoning" premised in part on "dysfunctional family attachments," Carlton's chronic infidelity and treatment of women, including Petitioner's mother, and the sexual abuse of Petitioner; and (4) "community poisoning" premised on gang activity, police brutality, and adolescent institutionalization. *Id*. at 384-85. Dr. Cunnigham elaborated on

each of these four areas by discussing specific instances, information, and how these instances impacted Petitioner's reasoning and actions. *Id.* at 386-400; Ex. G-3 at 401-534. Dr. Cunningham indicated that it was hard to say if Petitioner's stuttering was connected to neurological damage or was the result of the stress of living in Petitioner's household. *Id.* at 390-91. Dr. Cunningham opined that the presence of learning difficulties, recurrent head traumas, misconduct and explosive temper, and early drug use should have prompted a neuropsychological assessment of Petitioner. *Id.* at 394-95. He stated that the mitigating circumstances he identified implicated Petitioner's moral culpability to the extent they diminished his control. (Ex. G-3 at 420-21.) Dr. Cunningham said that although evidence was presented during the penalty phase about the physical abuse Petitioner suffered from Carlton, he did not think Dr. Herkov adequately discussed the implications of the physical abuse in that such abuse often results in criminally violent conduct by the abused individual. *Id.* at 470-73.

Dr. Dee, a clinical psychologist and neuropsychologist, testified at the post-conviction evidentiary hearing. (Ex. G-3 at 593.) Dr. Dee conducted a neuropsychological evaluation of Petitioner, during which he gave Petitioner the following tests: (1) Wechsler Adult Intelligence Scale; (2) the Denman Neuropsychology Neuroscale; (3) the Wisconsin Card Sorting Task; (4) Categories Test; (5) Judgment of Line Orientation Test; (6) Test and Facial Recognition; and (7) the Wechsler Intelligence Scale. (Ex. G-3 at 598; Ex. G-4 at 618-19.) Petitioner told Dr. Dee that around the age of seven he fell from a bicycle, struck his head and was rendered unconscious for a few minutes and that around the age of fifteen

he was hit on the head by a shovel after which he suffered from headaches in the right frontal area of his head.  (Ex. G-4 at 608.)  Dr. Dee indicated that Petitioner's history of trauma was relevant to his neuropsychological condition.  *Id*. at 614.  Dr. Dee testified that Petitioner had an IQ of 89 and a full memory scale of 93.  *Id*. at 621, 630.  He stated that Petitioner was unable to complete the Wisconsin Card Sorting Test, which identifies frontal lobe damage.  *Id*. at 627, 634.  Petitioner also failed the Categories Test, which tests for frontal lobe damage.  *Id*. at 628, 633-34.  Petitioner's results on the remaining tests were within expected limits for his general mental ability.  *Id*. at 635.  Dr. Dee opined that Petitioner suffers from frontal lobe damage, which limits his ability to inhibit his behavior.  *Id.* at 635-36, 639.  He indicated that frontal lobe damage demonstrates statutory mitigators because it creates a substantial impairment in one's ability to conform one's conduct to the law and is a major emotional disorder.  *Id.* at 681-82.  Dr. Dee stated, however, that someone with frontal lobe damage generally would not be referred to by friends as dependable.  *Id.* at 672-73.

Dr. David Frank, a psychiatrist, testified at the evidentiary hearing.  *Id.* at 797-98.  Dr. Frank evaluated numerous records related to Petitioner and interviewed him.  (Ex. G-5 at 801-05.)  Dr. Frank opined that Petitioner had some mental illness, namely personality disorder, but did not have extreme emotional disturbances so as to qualify for a statutory mitigator.  *Id.* at 806.  Dr. Frank further stated that he did not find any evidence demonstrating that Petitioner was unable to conform his behavior to the law, so as to qualify for another statutory mitigator.  *Id.* at 805-06, 845.  Dr. Frank testified that Petitioner

had antisocial personality disorder. *Id.* at 818-22. Dr. Frank indicated that impulsive behavior and failure to plan ahead, characteristics of frontal lobe damage, are also characteristics of antisocial personality disorder. *Id.* at 831-32. Dr. Frank disagreed with Dr. Dee's conclusion that Petitioner's performance on the Wisconsin Card Sorting Test demonstrated frontal lobe damage, *id.* at 840-41, 864, and he opined that Petitioner does not suffer from brain injury. *Id.* at 848-49, 891-93, 895. Dr. Frank indicated that headaches would not be an indicator of brain injury. *Id.* at 875.

Robert LeBlanc ("LeBlanc") and Francis Iennaco ("Iennaco"), Petitioner's defense attorneys, testified at the evidentiary hearing that they hired Barb Pizarroz ("Pizarroz"), an investigator, to obtain mitigation evidence.[10] (Ex. G-5 at 978-79; Ex. G-6 at 1024, 1046.) Iennaco stated that he and LeBlanc discussed whether there was any statutory mitigation based on Petitioner's mental health and determined that there did not appear to be any such evidence. (Ex. G-5 at 983.)

LeBlanc testified that Pizarroz spent several days in the Bahamas interviewing Petitioner's family members, including Carlton, and the dean of a school Petitioner attended, and she obtained Petitioner's school records. (Ex. G-5 at 978-79; G-6 at 1025, 1027.) LeBlanc also spoke with some of Petitioner's family members in preparation for the penalty phase. (Ex. G-6 at 1029-30.) Pizarroz compiled, and provided LeBlanc with, reports regarding the information she discovered during her investigation. *Id.* at 1025-29.

---

[10]Iennaco testified that although he was involved with the entire case, LeBlanc was responsible for preparing the mitigation evidence. (G-5 at 963, 981.)

LeBlanc also hired Dr. Herkov to evaluate Petitioner and aid the defense during the penalty phase. (G-6 at 1028-29.) LeBlanc provided Dr. Herkov with Pizarroz's documents and reports for consideration in his evaluation. *Id.* at 1029.

LeBlanc testified that he called four witnesses to testify during the penalty phase, Petitioner's mother, sister, Dr. Herkov, and Petitioner's girlfriend. *Id.* at 1031-32. LeBlanc indicated that he wanted Carlton, who lives in the Bahamas, to testify, but he thought that Carlton did not come to testify because he was reluctant to be portrayed as an alcoholic. *Id.* at 1032-33. The defense presented mitigating evidence concerning Carlton's alcohol use and abusive behavior through the testimony of Petitioner's mother and sister and Dr. Herkov. *Id.* at 1034, 1037. LeBlanc did not investigate the issue of potential brain injury to Petitioner. *Id.* at 1050. However, LeBlanc testified that he might have relied on Dr. Herkov to make a recommendation for a neurological assessment, and he would not have pursued the matter independently absent such a recommendation from Dr. Herkov. *Id.* at 1050-51. LeBlanc stated that if Petitioner was diagnosed with antisocial personality disorder, he likely would not have wanted the jury to know of such a diagnosis. *Id.* at 1039.

### iii.    *Consideration of Claim*

Petitioner asserts that counsel was ineffective for failing to call Carlton as a witness at the penalty phase to demonstrate the abuse Petitioner suffered. (Doc. No. 1 at 34.) Petitioner further contends that counsel failed to present a complete biographical assessment of Petitioner such as provided by Hammock during the evidentiary hearing, which would have included evidence that Petitioner was sexually abused. *Id.* at 34-35.

The record demonstrates that counsel conducted a reasonable investigation into potential mitigating evidence. Counsel was provided information indicating that Petitioner's father was an alcoholic, Petitioner had a drinking problem, that Carlton beat Petitioner's mother, and that Petitioner had used drugs since the age of thirteen. (Ex. GGG-2 at 320-334.) Pizarroz, an experienced investigator, interviewed Carlton and other family members and reported those findings to counsel. The record reflects that Pizarroz spoke with Petitioner's mother several times; DeShane Claer; Verniki Butler; Carlton Darling; three of Petitioner's Bahamian friends and co-defendants in other cases; Deborah Rolle, Petitioner's juvenile probation officer; Petitioner's half-sister; Harlan Dean, an administrator at a juvenile detention facility at which Petitioner was held; and three Bahamian policemen, one of whom was Petitioner's neighbor. (Ex. GGG-2 at 276-317.) Pizzaroz provided counsel with reports from these interviews, and counsel provided those reports to Dr. Herkov. Moreover, Pizzaroz obtained Petitioner's school records and sought to obtain his medical records but apparently was unable to do so because such records were not available. Furthermore, Carlton was interviewed prior to the penalty phase, and Dr. Herkov reviewed the transcript from the interview. (Ex. GGG-4 at 572-603.)

As discussed *supra*, the record reflects that LeBlanc presented evidence through Ms. Smith, Ms. Butler, and Dr. Herkov that Petitioner was physically, emotionally, and verbally abused as a child. These witnesses testified about specific instances of abuse, the severity of the abuse, and the frequency of the abuse. In fact, Dr. Herkov characterized Carlton's abuse of Petitioner as extreme. The jury also heard evidence that Carlton was an alcoholic

and that Ms. Butler blamed her mother for allowing them to be subjected to Carlton's abuse. Finally, Dr. Herkov mentioned the sexual abuse during his testimony. Although Carlton may have provided more explicit details about the frequency of the abuse, given the evidence presented at the penalty phase regarding the abuse suffered by Petitioner, the Court cannot conclude that the state courts' determination that additional evidence of such abuse was cumulative and counsel was not ineffective for presenting such evidence is objectively unreasonable. *See, e.g., Stewart*, 476 F.3d at 1218; *see also Van Poyck v. Florida Dept. of Corrections*, 290 F.3d 1318, 1324 (11th Cir. 2002) (holding "[t]he presentation of life-history evidence at the trial satisfied the performance element of the *Strickland* test. That additional evidence might exist does not establish defective performance. It is well-settled in this Circuit that a petitioner cannot establish an ineffective assistance claim simply by pointing to additional evidence that could have been presented.").

Petitioner does not specifically argue in the instant petition that counsel was ineffective for failing to investigate and present evidence regarding the alleged beating he suffered at the Fox Hill Prison, the conditions at the Fox Hill Prison, Petitioner's history of alcohol and drug abuse, or Petitioner's history of gang involvement. Assuming, however, that Petitioner is attempting to challenge counsel's failure to do so, the Court cannot conclude that counsel was ineffective in failing to obtain or present such evidence. The Eleventh Circuit has frequently indicated "that evidence of a defendant's alcohol or drug abuse holds little mitigating value and may have the counterproductive effect of alienating the jury." *Stewart*, 476 F.3d at 1217 (citing *Haliburton v. Sec'y for Dept. of Corr.*, 342 F.3d 1233,

1244 (11th Cir. 2003) ("[E]vidence [of substance abuse] can often hurt the defense as much or more than it can help."); *Crawford v. Head*, 311 F.3d 1288, 1321 (11th Cir. 2002) ("[S]uch evidence often has little mitigating value and can do as much or more harm than good in the eyes of the jury."); *Grayson v. Thompson*, 257 F.3d 1194, 1227 (11th Cir. 2001) ("[W]e note that emphasizing [the petitioner's] alcoholic youth and intoxication may also have been damaging to [the petitioner] in the eyes of the jury.")); *see also McClain v. Hall* 552 F.3d 1245, 1253 (11th Cir. 2008) (noting that "evidence of substance abuse is often a 'two-edged sword' that provides little mitigating value . . . ."). "Rarely, if ever, will evidence of a long history of alcohol and drug abuse be so powerful that every objectively reasonable lawyer who had the evidence would have used it." *Stewart*, 476 F.3d at 1217.

Moreover, as to evidence related to Petitioner's detention in Fox Hill Prison, the state court's determination that the evidence was inconclusive that Petitioner was beaten at the prison is supported by the record. Smith testified that he worked at the prison while Petitioner was incarcerated there, and Petitioner never told him that he was beaten. Furthermore, McIntosh was not at the Fox Hill Prison when Petitioner was incarcerated, and Rahming indicated that he did not see the guards beat Petitioner. Additionally, the Court notes that if counsel had presented evidence regarding Petitioner's incarceration at the Fox Hill Prison and the conditions of the prison, it necessarily follows that the jury would have learned that Petitioner was incarcerated at the prison and arguably could have led to the introduction of evidence regarding the offense Petitioner allegedly committed in the Bahamas. Thus, the Court concludes that the state court's determination that counsel

was not ineffective for failing to ascertain or present such evidence is not an objectively unreasonable application of *Strickland*.

Likewise, the Court cannot conclude that the state court's determination that counsel could have reasonably relied on Dr. Herkov to notify them that Petitioner should be evaluated for brain damage was objectively unreasonable. *See, e.g., McClain v. Hall*, 552 F.3d 1245, 1252 (11th Cir. 2008) (concluding that counsel was permitted to rely on the mental health expert's report and noting that "a reasonable attorney could have expected a mental health expert to report to counsel evidence of abuse"). Counsel provided Dr. Herkov with the reports compiled by Pizarroz, and Dr. Herkov interviewed and tested Petitioner. Dr. Herkov clearly was aware that Petitioner had suffered head injuries as a child. *See* Ex. GGG-2 at 371 (Dr. Herkov's mitigation report states, "[Ms. Smith] reports [ Petitioner] was struck in the head with a baseball bat at age 13 by another youth. She reported a brief loss of consciousness. . . ."). Dr. Herkov, however, determined that Petitioner exhibited antisocial behavior, and he linked the change in Petitioner's behavior to the abuse Petitioner suffered as a child. *See id.* at 371-74. Dr. Herkov opined that Petitioner did not qualify for statutory mitigation. *Id.* at 373. Petitioner's ability to obtain a more favorable expert opinion than Dr. Herkov's opinion does not require a finding of deficient performance. *See, e.g., McClain*, 552 F.3d at 1252 (concluding that counsel was not ineffective for failing to discover the petitioner's alleged frontal lobe disorder because counsel could reasonably rely on expert's opinion).

Moreover, as noted by the Florida Supreme Court, contradictory expert opinions

were presented at the Rule 3.851 evidentiary hearing regarding whether Petitioner in fact suffers from frontal lobe damage. Dr. Dee testified that Petitioner did suffer from frontal lobe damage, which qualified him for the application of statutory mental health mitigators. However, Dr. Frank testified that Petitioner did not suffer from brain injury but instead suffers from antisocial personality disorder and that he did not qualify for statutory mental health mitigators.

Finally, Petitioner has not demonstrated that he was prejudiced by counsel's failure to investigate or present the aforementioned evidence. Two statutory aggravators were found to exist, that Petitioner had previously been convicted for a felony involving the use or threat of violence and the capital felony was committed while Petitioner was engaged in an armed sexual battery. The jury heard the victim of the taxi cab robbery describe how Petitioner shot him in the back of the head during a robbery, much like the victim in this case was shot in the back of the head. The jury also heard evidence that Petitioner suffered extreme abuse as a child and that abused individuals more frequently engage in antisocial behavior. Evidence related to Petitioner's drug use and the conditions of his prior incarceration in the Bahamas likely would have been given little if any mitigating weight and may have harmed Petitioner's case by revealing the existence of other offenses or convictions. The evidence regarding Petitioner's alleged frontal lobe damage was contradicted by the State's expert, and thus, had such evidence been presented it unclear whether any statutory mitigators would have been found. Finally, the state court found one statutory mitigator and nineteen non-statutory mitigators. In sum, Petitioner has failed

to demonstrate that the state court's determination that counsel was not ineffective in failing to investigate or present mitigation evidence is an objectively unreasonable application of *Strickland*. Accordingly, claim seven is denied pursuant to Section 2254.

## H.     Claim Eight

Petitioner asserts that trial counsel rendered ineffective assistance by failing to challenge the Florida Department of Law Enforcement's ("FDLE") DNA laboratory quality assurance standards. In support of this claim, Petitioner contends that the FDLE laboratory failed to follow its quality assurance procedures in analyzing the DNA evidence admitted at trial and such evidence would have undermined the reliability of the DNA evidence.

Petitioner raised this claim in his Rule 3.851 motion, and the state court conducted an evidentiary hearing and subsequently denied relief. In denying the claim, the trial court noted that Janine Arvizu ("Arvizu"), a quality assurance consultant who performs quality assurance audits and data quality assessments of laboratories, reviewed the FDLE records in relation to the DNA testing performed in this case and determined that "the procedures and methods utilized by FDLE fell well below accepted industry standards." (Ex. G-10 at 1826.) Arvizu further opined that FDLE "had inadequate custody control procedures in place, failed to run the necessary controls to ensure against cross-contamination, and, at the time of testing, did not have a quality assurance program in place." *Id.* The trial court determined, however, that Arvizu was not qualified to question the DNA results, and therefore, a reasonable probability did not exist that testimony such as Arvizu's would have undermined the DNA evidence. *Id.* at 1827. The trial court further found that defense

counsel made a strategic decision based on the information provided to counsel from Petitioner to challenge the DNA evidence based on the statistical analysis of the DNA evidence. *Id.* at 1828.

Petitioner appealed the state court's denial of this claim. The Florida Supreme Court affirmed pursuant to *Strickland*. *Darling*, 966 So. 2d at 382. In so ruling, the Court reasoned:

> Darling can prove neither the deficiency nor the prejudice prong of the *Strickland* test with regard to this issue. During the evidentiary hearing, trial counsel Iennaco and LeBlanc testified that although they had considered challenging the DNA results in this case, they decided not to do so after Darling informed counsel LeBlanc that he was having an affair with the victim. They reasoned that it would be a waste of resources to challenge the DNA results when Darling admitted that his DNA would be in the victim. Therefore, trial counsel's decision not to challenge the DNA test results constitutes trial strategy. This Court has established that "strategic decisions do not constitute ineffective assistance of counsel if alternative courses have been considered and rejected and counsel's decision was reasonable under the norms of professional conduct." *Howell v. State*, 877 So. 2d 697, 703 (Fla. 2004) (quoting *Occhicone v. State*, 768 So. 2d 1037, 1048 (Fla. 2000)). The defendant carries the burden to overcome the presumption of effective assistance: "[T]he defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Strickland*, 466 U.S. at 689, 104 S.Ct. 2052 (quoting *Michel*, 350 U.S. at 101, 76 S. Ct. 158). Given Darling's statements that he and the victim were having a love affair at the time of the murder, it was reasonable trial strategy for counsel not to challenge forensic evidence that was consistent with this position. Additionally, performance by trial counsel cannot be viewed as deficient on this point because, despite this valid strategic reason for not challenging the DNA results, trial counsel did challenge the DNA test results from a statistical standpoint with regard to the statistical validity of using various population subset databases which were not specifically developed using the DNA of people of Bahamian origin. *See Darling*, 808 So.2d at 159-60.
>
> Ms. Arvizu's quality assurance protocol testimony does not change the fact that trial counsel had a valid strategic basis for not challenging the

DNA results. Additionally, as noted by the trial court in the order denying postconviction relief, Ms. Arvizu admitted that she was only qualified to critique the laboratory protocol used in this case and was not at all qualified to challenge the actual test results. Therefore, the trial court correctly concluded that Ms. Arvizu's testimony would not have excluded or undermined the reliability of the DNA test results.

Additionally, even if trial counsel were deficient for failing to challenge the DNA evidence, Darling cannot satisfy the prejudice prong. The trial court concluded that Ms. Arvizu's conclusions that the FDLE laboratory utilized inadequate quality assurance measures would not have undermined the DNA results admitted at trial. Darling has not and cannot establish that he was prejudiced by trial counsel's failure to mount such an attack.

*Id.* at 382-83.

The record demonstrates that Arvizu testified at the Rule 3.851 evidentiary hearing that she is a quality assurance consultant who performs quality assurance audits of scientific laboratories. The state trial court found Arvizu to be an expert in forensic scientific laboratory quality assurance, Ex. G-9 at 1792 n.4, but admittedly, she is not a DNA expert . (Ex. G-4 at 778). Arvizu was critical of the FDLE laboratory used by the state to examine the physical evidence and opined that its records were illegible and incomplete, Ex. G-4 at 737, that there was inadequate custody control, *id.* at 742, and poor identification and tracking references to the evidence being examined, *id.* at 744, 752. Arvizu admitted, however, that independent oversight (audits) of forensic labs is a fairly new development. *Id.* at 747.

Iennaco testified at the Rule 3.851 evidentiary hearing that he had considered attacking the manner in which the DNA had been processed and the DNA results. (Ex. G-5 at 968.) Iennaco stated that he and his co-counsel, LeBlanc, had deposed the State's DNA

expert, David Baer ("Baer"), and did not find any "glaring problem" with the DNA results or with the procedures and evidence collection based on Baer's testimony. *Id*. at 969, 997. Iennaco indicated that around the time of Baer's deposition, Petitioner had told defense counsel that he had been having a sexual affair with the victim. *Id*. at 969-70. Iennaco testified that he and LeBlanc had discussions about whether to attack the DNA and decided not to do so. *Id*. at 975. When asked if Petitioner's statements to defense counsel that he and the victim were having an affair affected the manner in which counsel prepared for trial with respect to the DNA evidence, Iennaco stated:

> Well, if he had indicated to us that he had never had sex with her, then obviously we would have attacked the DNA, since it would have been wrong. But since he admitted to it we could still attack it, but knowing that it was probably correct, almost certainly correct, and that we would just be spending months of time banging our head [sic] against the wall.

*Id*. at 974. Iennaco stated that even though he had no reason to believe the DNA results were invalid based on Petitioner's statements, he did challenge the DNA evidence during cross-examination in relation to the population genetics concerning the statistical component of the DNA testing. *Id*. at 993, 999-1000.

LeBlanc also testified that Petitioner told him that he had been having an affair with the victim for six months prior to the murder. (Ex. G-6 at 1027.) LeBlanc stated that he filed a motion for a DNA expert, which the trial court granted. However, he and Iennaco decided not to hire a DNA expert because Petitioner admitted that he was sleeping with the victim. (Ex. G-6 at 1045.) LeBlanc stated that his overall strategy regarding the DNA evidence was to demonstrate that there was no evidence of when the semen was deposited

in the victim. *Id.* at 1052.

The state court concluded that defense counsels' decision not to challenge the DNA test results was trial strategy. "The question of whether an attorney's actions were actually the product of a tactical or strategic decision is an issue of fact, and a state court's decision concerning that issue is presumptively correct." *Provenzano v. Singletary*, 148 F.3d 1327, 1330 (11th Cir. 1998). Based on the testimony of LeBlanc and Iennaco, the Court finds that the record supports the state court's determination that counsels' decision regarding the DNA evidence was a strategic decision. Thus, the question then becomes whether defense counsel's strategy was reasonable.

"'[C]ounsel cannot be adjudged incompetent for performing in a particular way in a case, as long as the approach taken might be considered sound trial strategy.'" *Ward*, 592 F.3d at 1164 (quoting *Chandler v. United States*, 218 F.3d 1305, 1314 (11th Cir. 2000)). In relation to the issue of counsel's strategy, the Eleventh Circuit has stated:

> By "strategy," we mean no more than this concept: trial counsel's course of conduct, that was neither directly prohibited by law nor directly required by law, for obtaining a favorable result for his client. For example, calling some witnesses and not others is "the epitome of a strategic decision." [*Waters*, 46 F.3d] at 1512 (en banc); *see also id.* at 1518-19 (en banc); *Felker v. Thomas*, 52 F.3d 907, 912 (11th Cir. 1995) (whether to pursue residual doubt or another defense is strategy left to counsel, which court must not second-guess); *Stanley v. Zant*, 697 F.2d 955, 964 (11th Cir. 1983) (stating that reliance on line of defense to exclusion of others is matter of strategy).

*Id.* (quoting *Chandler*, 218 F.3d at 1314 n. 14). In *Strickland*, the Court stated:

> strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on

investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.

*Strickland*, 466 U.S. at 690-91.

In the instant case, Iennaco testified that he and LeBlanc deposed the State's expert and did not discover any problems with the DNA results or with the procedures and evidence collection based on Baer's testimony. (Ex. G-6 at 969, 997.) LeBlanc and Iennaco further testified that they considered challenging the DNA evidence and requested and obtained funds to do so. However, they determined, based on Petitioner's representations to them, that attacking the DNA evidence was not warranted given that the DNA results were "almost certainly correct" based on Petitioner's representations that he was sexually involved with the victim.

"[C]ounsel's decision not to investigate and develop favorable evidence must be reasonable and fall within the range of professionally competent assistance. Strategic choices to forego further investigation into an issue are not deficient when a reasonable professional judgment based on a sufficient initial inquiry supports the decision to terminate the investigation." *Lynd*, 470 F. 3d at 1316-17 (citing *Strickland*, 466 U.S. at 690-91). "'The reasonableness of a trial counsel's acts, including lack of investigation . . . , depends critically upon what information the client communicated to counsel.'" *Stewart*, 476 F.3d at 1211 (quoting *Chandler*, 218 F.3d at 1324); *see also Leal v. Dretke*, 2004 WL 2603736, at *8 (W.D. Tex. Oct. 20, 2004) (stating "[a]n attorney's strategic choices, usually

based on information supplied by the defendant and from a thorough investigation of relevant facts and law are virtually unchallengeable."). Thus, "[t]he objective reasonableness of a trial counsel's decisions must always be evaluated in the context of the information said counsel's client has imparted to him." *Id*. at *9; *see also Miller v. Anderson*, 255 F.3d 455, 457-59 (7th Cir. 2001) (concluding that when defendant claimed not to have been at the scene of the offense, counsel's failure to consult with a DNA expert to explore whether through DNA evidence defendant could prove that there was no evidence placing him at the offense constituted ineffective assistance), *vacated,* 268 F.3d 485 (7th Cir. 2001). Given the information provided to counsel by Petitioner - that he and the victim were sexually involved - and counsel's pre-trial examination of Baer, the Court concludes that counsel's failure to investigate the FDLE's DNA laboratory procedures was reasonable.[11] *See, e.g., Pace v. McNeil*, 556 F.3d 1211, 1224 (11th Cir. 2009) (concluding that defense counsel's decision to limit their investigation into the petitioner's substance abuse addiction was reasonable given the petitioner's statements made to defense counsel regarding his drug use at the time of the offense and given other witnesses' deposition testimony).

Moreover, Petitioner has not demonstrated that counsel's failure to challenge the

---

[11]In fact, during the penalty phase proceeding, Petitioner told the trial court:

I did not rape anyone. . . . I never, I never - - Mr. Ashton [the prosecutor] stated in the last mitigation. . . that I didn't know Grace Mlynarczyk - I never said I didn't know Grace Mlynarczyk. I never denied having a sexual relationship with Grace Mlynarczyk. So he was straying, had the jury off into a different direction.

(Ex. A-3 at 307.)

DNA evidence based on the FDLE's DNA laboratory protocols resulted in prejudice. Defense counsel did attempt to undermine the validity of the DNA evidence from a statistical standpoint in his cross-examination of Baer. The question thus becomes whether Arvizu's alleged protocol deficiencies would have lent support to counsel's attack on the State's DNA evidence.

If available at trial, would defense counsel have called Arvizu to testify? Probably not, because to do so would be contrary to their trial strategy of not directly attacking the <u>results</u> of the DNA evidence. Not being a DNA expert, Arvizu could not have discredited the State's DNA match, and her incomplete testimony in this regard may have simply highlighted the weakness in Petitioner's DNA defense.

Without a DNA expert to question the DNA <u>results</u>, this evidence fails to complete the logical loop necessary to undermine the DNA match. Although Petitioner provided evidence demonstrating that the FDLE's lab procedures and methods were inadequate and such evidence was available to challenge the DNA testing procedures employed by the State's experts, Petitioner has not offered evidence demonstrating that the findings made by the State's DNA experts were invalid. This finding is supported by Baer's testimony during the Rule 3.851 evidentiary hearing, wherein he defended the FDLE's lab procedures, stated that he had no doubt that the DNA analysis was done correctly, and indicated that two other independent laboratories had tested Petitioner's DNA sample and affirmed Baer's findings. (Ex. G-7 at 1218-21.) Petitioner offered no evidence showing that any basis existed for challenging the actual findings or conclusions made by the State's

DNA experts. In sum, the Court concludes that the state court's determination that Petitioner failed to demonstrate either deficient performance or prejudice in relation to the DNA evidence is neither contrary to, nor an unreasonable application of, *Strickland*. Accordingly, claim eight is denied pursuant to Section 2254(d).

## I.    Claim Nine

Petitioner argues that trial counsel rendered ineffective assistance by failing to object to the prosecutor's statements to the jury indicating that a death recommendation was legally required in certain circumstances. In support of this claim, Petitioner points to two statements made by the prosecutor during voir dire.

First, when questioning a venire member, the prosecutor said in pertinent part:

Let me rephrase the question this way. In order to be a juror in any kind of a case you have to take an oath in the beginning to follow the law, wherever it leads you.

In a case of this type, the law might lead you as you analyze it to vote death. [The] [q]uestion for you is, could you take an oath to follow the law, knowing that it might result in your voting to impose the death penalty?

(Ex. A-10 at 97-98.) Thereafter, the prosecutor made the following statements when questioning a venire member who had indicated that she could not vote to impose the death penalty:

Now, I asked the same question of one of the jurors this way. As a juror it would be your - - the way we start the process with the jurors, they take an oath to follow the law. Could you take the oath to follow the law if it meant that you might be compelled to vote to impose death, if that's what the law called for?

*Id*. at 115. Defense counsel did not object to either of the prosecutor's statements.

Petitioner raised this claim in his Rule 3.851 motion. The state court denied the claim, and Petitioner appealed. The Florida Supreme Court affirmed the denial of the claim pursuant to *Strickland*. In so ruling, the Court noted that Petitioner arguably demonstrated that counsel was deficient for failing to object to the prosecutor's statements because "comments to the effect that if the aggravators outweigh the mitigators, a recommendation of a death sentence is mandatory, misstate the law." *Darling*, 966 So. 2d at 384. The Court determined, however, that Petitioner failed to establish that he was prejudiced by counsel's failure to object to the statements because "following the improper prosecutorial comments during voir dire, the court here properly instructed the jury with regard to the weighing process involved in deciding what sentence to recommend. . . ." *Id.* Specifically, the trial court instructed the jury:

> The sentence that you recommend to the court must be based on the facts as you find from the evidence and the law. You should weigh the aggravating circumstances against the mitigating circumstances, and your advisory sentence must be based on these considerations.
>
> The weighing of aggravating and mitigating circumstances is not just a counting process. You are free to assign whatever weight you find appropriate to the aggravating and mitigating circumstances which are proved, and then make you own judgment about the appropriate penalty in light of the weighing process.

*Id.*

Upon review of the record, the Court concludes that the Florida Supreme Court's decision was not contrary to, or an unreasonable application of, clearly established Federal law. Even assuming that counsel was deficient for failing to object to the prosecutor's arguably erroneous statements during voir dire, the state court properly instructed the

64

jurors that they had to weigh the aggravators and mitigators and then determine whether a death sentence was warranted in their judgment. (Ex. A-3 at 296-97.) Thus, the jury instructions notified the jurors that a sentence of death was not mandated pursuant to Florida law. Given the state court's thorough penalty phase jury instructions, which Petitioner does not argue are inaccurate, the Court finds that Petitioner has failed to demonstrate that he was prejudiced by counsel's failure to object to the prosecutor's statements made during voir dire. *See, e.g., Johnson v. Alabama*, 256 F.3d 1156, 1184-85 (11th Cir. 2001) (concluding that any error resulting from defense counsel's improper statements during closing argument did not result in prejudice to the defendant because of trial court's jury instructions); *see also Shriner v. Wainwright*, 715 F.2d 1452, 1459 (11th Cir. 1983) (noting that "with a properly instructed jury, there is nothing to show the jury relied on the prosecutor's remarks"); *Grizzell v. Wainwright*, 692 F.2d 722, 726-27 (11th Cir. 1982) ("[a] jury is presumed to follow [the] jury's instructions as to evidence it may consider"). Accordingly, claim nine is denied pursuant to Section 2254(d).

## V.  CONCLUSION

The Court finds that none of the claims raised in the instant petition have merit or require a hearing in this Court. Any of Petitioner's allegations not specifically addressed herein are determined to be without merit. The Court determines that the petition must be denied and that this case must be dismissed with prejudice.

## VI.  CERTIFICATE OF APPEALABILITY

This Court should grant an application for certificate of appealability only if the

Petitioner makes "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). To make such a showing "the petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000); *see also Lamarca v. Secretary Dep't of Corrections*, 568 F.3d 929, 934 (11th Cir. 2009). When a district court dismisses a federal habeas petition on procedural grounds without reaching the underlying constitutional claim, a certificate of appealability should issue only when a petitioner shows "that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Id*; *Lamarca*, 568 F.3d at 934. However, a prisoner need not show that the appeal will succeed. *Miller-El v. Cockrell*, 537 U.S. 322, 337 (2003).

Petitioner has not demonstrated that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong. Moreover, petitioner cannot show that jurists of reason would find this Court's procedural rulings debatable. Petitioner has failed to make a substantial showing of the denial of a constitutional right. The Court will deny Petitioner a certificate of appealability.

Accordingly, it is hereby **ORDERED AND ADJUDGED** as follows:

1.      The Petition for Writ of Habeas Corpus filed by Dolan Darling, a/k/a Sean Smith, (Doc. No. 1) is **DENIED**, and this case is **DISMISSED WITH PREJUDICE**.

2.      The Clerk of the Court shall enter judgment accordingly.

66

**DONE AND ORDERED** at Orlando, Florida, this 17th day of June, 2010.

GREGORY A. PRESNELL
UNITED STATES DISTRICT JUDGE

Copies to:
sc 6/17
Counsel of Record